**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-2085**

SANDRA M. PETERS, on behalf of herself and all others similarly situated,

Plaintiff – Appellant,

v.

AETNA INC.; AETNA LIFE INSURANCE COMPANY; OPTUMHEALTH CARE SOLUTIONS, INC.,

Defendants – Appellees.

------------------------------

AMERICAN MEDICAL ASSOCIATION; MARYLAND STATE MEDICAL SOCIETY; MEDICAL SOCIETY OF VIRGINIA; NORTH CAROLINA MEDICAL SOCIETY; SOUTH CAROLINA MEDICAL ASSOCIATION,

Amici Supporting Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, District Judge.  (1:15-cv-00109-MR)

Argued:  October 26, 2020                                    Decided: June 22, 2021

Before AGEE, FLOYD and THACKER, Circuit Judges.

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Floyd and Judge Thacker joined.

**ARGUED:** D. Brian Hufford, ZUCKERMAN SPAEDER LLP, New York, New York, for Appellant. Earl B. Austin, III, BAKER BOTTS L.L.P., New York, New York; Brian D. Boone, ALSTON & BIRD, LLP, Charlotte, North Carolina, for Appellees. **ON BRIEF:** Jason M. Knott, Washington, D.C., Jason S. Cowart, Nell Z. Peyser, ZUCKERMAN SPAEDER LLP, New York, New York; Larry S. McDevitt, David Wilkerson, THE VAN WINKLE LAW FIRM, Asheville, North Carolina, for Appellant. Michael R. Hoernlein, Rebecca L. Gauthier, ALSTON & BIRD LLP, Charlotte, North Carolina; E. Thomison Holman, HOLMAN LAW, PLLC, Asheville, North Carolina; Jessica F. Rosenbaum, BAKER BOTTS L.L.P., New York, New York, for Appellees. Leonard A. Nelson, Kyle A. Palazzolo, AMERICAN MEDICAL ASSOCIATION, Chicago, Illinois, for Amici American Medical Association, North Carolina Medical Society, Maryland State Medical Society, South Carolina Medical Association, and Medical Society of Virginia.

---

AGEE, Circuit Judge:

Sandra Peters appeals the district court's grant of summary judgment in favor of Aetna Inc., Aetna Life Insurance Company, and Optumhealth Care Solutions, Inc. (individually, "Aetna" and "Optum"; collectively, "Appellees"), as well as the denial of her motion for class certification. For the reasons discussed below, we affirm in part, reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

Mars, Inc. ("Mars") operated a self-funded health care plan ("the Plan") and hired Aetna as a claims administrator of the Plan pursuant to a Master Services Agreement ("MSA").[1] Under the MSA, Aetna's obligations included processing the participants' claims for the Plan and providing a cost-effective network of health care providers. The MSA contained a "Service and Fee Schedule" ("the Fee Schedule"), explaining that "[a]ll Administrative Fees from this [Statement of Available Services] are summarized in the following Service and Fee Schedule." J.A. 6025. The Fee Schedule notes that ███████████████████████████████████████████████████████ ████████████████████ J.A. 6026, 6028. Aetna's compensation, in return for providing all of the agreed services under the MSA, was set at █████████████████ , meaning

---

[1] Mindful of the standard on summary judgment, we recite the facts herein in the light most favorable to the non-moving party, Peters. *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 198 (4th Cir. 2005).

that ████████████████████████████████████████████████████

████████████████████████████ J.A. 3142.

<u>The Aetna-Optum Relationship</u>

The MSA permitted Aetna to subcontract "[t]he work to be performed by Aetna" for the Plan. J.A. 5999. Aetna subsequently executed such subcontracts with Optum for Optum to provide chiropractic and physical therapy services to the Plan participants for more cost-effective prices than Aetna alone could provide. Optum's "downstream providers" offered in-network services to Aetna insureds (including the Plan participants) at competitive rates. In exchange for Optum's services, it was to be paid a fee.

Section 20(B) of the MSA specified that "Aetna shall be solely responsible for payments due such subcontractors." J.A. 5999. However, Aetna did not wish to pay Optum out of the fees it received from Mars through the Plan. Instead, Aetna requested that Optum "bury" its fee within the claims submitted by Optum's downstream providers. J.A. 2692. By doing so, the Plan and its participants effectively would pay part or all of Optum's administrative fee notwithstanding the contrary terms of the MSA.

As a result, the fee breakdown for health care services provided to Plan participants through Optum operated as follows: After treatment, the health care provider submitted its claim to Optum for the services rendered. Optum then added a "dummy code" to the claim from the Current Procedural Terminology ("CPT")[2] to reflect a bundled rate fee, consisting

---

[2] The CPT is "a uniform coding used in 'identifying, describing, and coding medical, surgical, and diagnostic services performed by practicing physicians.'" *Newport News Shipbuilding & Dry Dock Co. v. Loxley*, 934 F.2d 511, 513 n.2 (4th Cir. 1991) (citation

of Optum's administrative fee and the cost of the health care provider's services. Optum would then forward the bundled rate fee claim to Aetna for its approval. In turn, this bundled rate fee would be paid based on the Plan's responsibility framework, depending on the coinsurance required and whether a patient-paid deductible had been reached.

Appellees sought to keep this fee breakdown from being known by Mars or the Plan participants. As one Aetna employee explained, "We need to ensure that the members are not being relayed this information about wrap or administration fees as they are feeling they are absorbing costs, which in turn makes most of them unhappy." J.A. 2699. Nonetheless, some Aetna and Optum employees exhibited concern over the fee "bumping" arrangement, stating, for instance:

> The scenario where the co-insurance amount is calculated based on Aetna's payment to us is very problematic – the essence of the [Department of Insurance ("DOI")] complaint on this will be patients are being forced to pay a % of our fee, this is not going to viewed favorably by the DOI.

J.A. 2647.

## The Terms of the Plan

Plan Participants received a Summary Plan Description ("SPD"), which set out their rights and benefits under the Plan, including the charges for health care services and their participant responsibility. And in the circumstances of this case, the SPD represents the

---

omitted). It is "the most widely accepted" system of coding "under government and private health insurance programs." *Id.* (citation omitted).

terms[3] of the Plan.[4] Relevant to this appeal, the SPD, as also reflected in the subcontract provision of the MSA, did not authorize the Plan or its participants to be charged Optum's administrative fee. This is evident when considering the SPD's definitions of appropriate charges. The SPD defines "Negotiated Charge" as "the maximum charge a Network Provider has agreed to make as to any service or supply for the purpose of the benefits under this Plan." J.A. 3067. Critically, "[t]he Plan does not cover expenses that are not considered Medically Necessary or appropriately provided." J.A. 3030. "Charges for a service or supply furnished by a Network Provider in excess of the Negotiated Charge" are not covered. J.A. 3032.

Under the Plan, a "Network Provider" does not encompass an entity such as Optum, as that is defined to be "[a] health care provider or pharmacy that has contracted to furnish

---

[3] The Supreme Court has indicated that "the summary documents, important as they are, provide communication with beneficiaries about the plan, but that their statements do not themselves constitute the terms of the plan." *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) (emphasis omitted). Indeed, the SPD directs the parties to the Mars Plan for the actual substance of the agreement: "The complete terms and conditions of the Plan are described in a comprehensive legal Plan document. This SPD is not intended to cover every circumstance contained in the Plan document." J.A. 3001. But the actual Plan document is not in the record and neither the parties nor the district court appear to have addressed or relied on it during this litigation, instead referencing the SPD as fully representative of the Plan. Nor has any claim been made that the SPD varies in any material way from the Plan. We therefore accept the SPD as representative of the Plan as "it was [the parties'] burden to place that evidence before the court. [The parties] failed to do so, and we are confined to the record before us." *Prichard v. Metro. Life Ins. Co.*, 783 F.3d 1166, 1171 (9th Cir. 2015); *see, e.g.*, *MBI Energy Servs. v. Hoch*, 929 F.3d 506, 511 (8th Cir.), *cert. denied*, 140 S. Ct. 541 (2019) ("*Amara* does not prevent a summary plan description from functioning as the plan in the absence of a formal plan document."). Therefore, we proceed with the understanding that the SPD operates as the terms of the Plan.

[4] We use the terms "Plan" and "SPD" interchangeably except where specifically identified otherwise.

6

services or supplies for this Plan, but only if the provider is, with Aetna's consent, included in the directory as a Network Provider." J.A. 3067. In contrast, an "Out-of-Network Provider" is "[a] health care provider or pharmacy that has not contracted with Aetna, an affiliate or a third-party vendor to furnish services or supplies for this Plan." J.A. 3067. As explained below, Optum is not a health care provider or pharmacy.

The SPD further explains the payment responsibility framework for Plan benefits, reflecting that the "Annual Deductible" is "[t]he part of [the Plan participant's] Covered Expenses [they] pay each calendar year before the Plan starts to pay benefits." J.A. 3063. And "Coinsurance" is "[t]he amount [the Plan participant] pay[s] for Covered Expenses after [they] have met the annual deductible." J.A. 3064. Finally, "Annual Coinsurance Maximum" is "[t]he amount of Coinsurance [the Plan participant] pay[s] each year before the Plan pays 100% of the Negotiated Charge (for in-network services)." J.A. 3063. As these definitions provide, each calendar year stands on its own, so that a Plan participant begins anew the process of accruing her Annual Deductible and Annual Coinsurance Maximum each year.

In application, the Plan required Peters, who participated in the Plan through her husband's employment with Mars, to pay 100% of covered expenses until she met her annual deductible of $250. After reaching the deductible, she was responsible for paying 20% of the covered expenses for claims as coinsurance, and the Plan paid the other 80% of those claims. However, once Peters paid the annual coinsurance maximum of $1,650, the Plan paid 100% of covered expenses for the rest of the year.

7

From 2013 to 2015, in addition to obtaining other non-Optum medical services, Peters received treatment from chiropractors and physical therapists provided by Optum under its contract with Aetna. Based on her comparison of the Explanation of Benefits ("EOBs") documents she received to the remittance advice forms that Optum sent her health care providers, Peters determined that she made payments in excess of her health care provider's Negotiated Charge, which was the amount owed according to the terms of the Plan.

For instance, Peters received treatment from a provider in Optum's network on July 16, 2014. The health care provider submitted a claim to Optum for $40, but the provider's Negotiated Charge with Optum was limited to $34. When Optum received the health care provider's claim, it added the dummy CPT code to cover its administrative fee of $36.89, resulting in a bundled rate fee of $70.89 ($34.00 + $36.89). When the claim reached Aetna, it then applied the Plan's responsibility framework, determining that Peters owed her coinsurance of 20% so that she paid $14.18 of the $70.89 bundled rate fee, while the Plan owed the balance ($56.71). Because Peters had paid her coinsurance charge of $14.18 and the Negotiated Charge between the provider and Optum was for $34, Optum paid the balance due of $19.82 to the provider and kept the remaining $36.89 that it received from Aetna on behalf of the Plan.

Conversely, had the Plan's responsibility framework been applied based on the health care provider's Negotiated Charge of $34 alone, and not the bundled rate fee, Peters would have owed only 20% of $34 ($6.80) and the Plan would have owed 80% ($27.20).

Accordingly, Peters alleged that Appellees had overcharged her and the Plan, although she did not take into account the cumulative impact of her annual deductible and coinsurance payments, as well as the effect of her other non-Optum medical services.

The Lawsuit

In June 2015, Peters filed a class action complaint against Appellees, alleging violations of the Employee Retirement Income Security Act ("ERISA").[5] Pursuant to ERISA § 404, 29 U.S.C. § 1104; and ERISA § 502(a)(1)–(3), 29 U.S.C. § 1132(a)(1)–(3),[6] Peters alleged that Appellees breached their fiduciary duties to her and the Plan based on Aetna's arrangement to have the Plan and its participants pay Optum's administrative fee via the bundled rate. Accordingly, Peters brought suit not only to redress the harm she suffered due to Appellees' actions, but also "for breach of fiduciary duty under ERISA on behalf of the Mars, Inc. Health Care Plan." J.A. 49.

Peters also alleged that Appellees engaged in comparable violations in their dealings with similarly situated plans and their participants, so she requested to represent two classes of such similarly situated plans and their participants: (1) "[a]ll participants or beneficiaries of self-insured ERISA health insurance plans administered by Aetna for which plan responsibility for a claim was assessed using an agreed rate between Optum and Aetna that

---

[5] Peters also alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The district court granted Appellees' motion to dismiss these claims, and Peters does not challenge the disposition of those claims.

[6] To prevent confusion between citations to the sections of ERISA itself and citations to the sections of the United States Code in which ERISA is codified, all in-text references to ERISA provisions will be made to the sections of ERISA itself.

exceeded the provider's contracted rate with Optum for the treatment provided"; and (2) "[a]ll participants or beneficiaries of ERISA health insurance plans insured or administered by Aetna for whom coinsurance responsibility for a claim was assessed using an agreed rate between Optum and Aetna that exceeded the provider's contracted rate with Optum for the treatment provided." J.A. 1183. Peters sought equitable relief on behalf of herself, the Plan, and the class members in the form of restitution, surcharge, disgorgement, and declaratory and injunctive relief.

The district court denied class certification because it determined that the ascertainability and commonality requirements of Rule 23(a) of the Federal Rules of Civil Procedure were not met. As to ascertainability, the district court discounted Peters' theory of financial injury, which led it to conclude that she "failed to demonstrate that there exists a class of participants who have actually been harmed by the Aetna-Optum arrangement." J.A. 2724–29. Regarding commonality, the district court underscored the advantages it perceived that participants received through an expanded network of providers based on the Aetna-Optum relationship. The district court found that "[a] proposed class challenging conduct that did not harm – and in fact benefitted – some proposed class members fails to establish the commonality required for certification." J.A. 2735.

Subsequently, the district court concluded that neither Aetna nor Optum could be held liable under ERISA, as they were not operating as fiduciaries when engaging in the actions at the heart of Peters' complaint, and granted Appellees' motions for summary judgment:

> [T]he Court notes that it has already recognized that Aetna served only as a limited fiduciary with respect to the Plaintiff and the Mars Plan. As the Court previously concluded, Aetna was not serving in a fiduciary capacity when it negotiated "with Optum to establish and maintain a provider network that benefitted a broad range of health-care consumers . . . ." Aetna contracted with Optum in order to lower physical therapy and chiropractic costs for Aetna plan sponsors and members generally, and this contractual relationship has proven to be successful, saving millions of dollars for both plan sponsors and members.

J.A. 3233 (alteration in original) (internal citations omitted).

Relatedly, the district court determined that Aetna did not breach any fiduciary duty and that neither Peters nor the Plan suffered a loss due to any of the alleged ERISA violations. Specifically, the district court concluded that Peters failed to "demonstrate[] how she could have possibly suffered any injury from EOB statements documenting health care transactions that, on balance, saved her money." J.A. 3235. In this vein, the district court characterized Peters' theory of financial injury as "premised on the assertion that [Peters] would have paid less for her physical therapy and chiropractic benefits without the Aetna-Optum relationship in place, i.e., that Aetna somehow should have provided her access to the Optum network of providers directly, without Optum's participation." J.A. 3238. In doing so, the district court utilized a hypothetical construct in which the Aetna-Optum contractual relationship did not exist, crediting the Aetna-Optum relationship as saving "both Aetna plan sponsors and members millions of dollars," and determining that Peters "suffered no financial loss" and "did *not* actually pay such inflated co-insurance amounts." J.A. 3238, 3242.

Finally, the district court held that Optum could not be held liable as either a fiduciary or party in interest under ERISA. The district court reasoned that Optum did not

qualify as a fiduciary because Aetna retained the reigns in the Aetna-Optum contracts, which were negotiated at arm's length and involved Optum conducting purely administrative services. It further indicated that Optum could not be properly characterized as a party in interest because Optum had no preexisting relationships with either the Plan or Aetna.

Peters timely appealed, and this Court has jurisdiction under 28 U.S.C. § 1291. We review the district court's order granting summary judgment de novo. *Garofolo*, 405 F.3d at 198. "Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (citation and internal quotation marks omitted).

II.

On appeal, Peters raises several claims of error, including challenges to the district court's view of Aetna and Optum as neither fiduciaries nor parties in interest under ERISA, their breach of fiduciary duty, and the viability of her class certification claims. Before considering these questions, we first address the relevant ERISA provisions and Peters' claims under them, her standing to proceed,[7] and the merits of her financial injury theory.

---

[7] Although Appellees do not expressly raise a question of Article III standing, "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

A.

We begin with an overview of the ERISA provisions relevant to Peters' claims, explaining their significance in the ERISA context and framing the related discussions of standing and the merits of Peters' claims.

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)). To protect participants in employee benefit plans, ERISA "establish[es] standards of conduct, responsibility, and obligation[s] for fiduciaries of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44 (1987) (quoting 29 U.S.C. § 1001(b)). Trust law "serves as ERISA's backdrop." *Beck v. PACE Int'l Union*, 551 U.S. 96, 101 (2007); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) ("ERISA abounds with the language and terminology of trust law.").

ERISA authorizes a broad range of remedies for cognizable violations, including recovery of "plan benefits, attorney's fees and other statutory relief." 10 Vincent E. Morgan, *Business and Commercial Litigation in Federal Courts* § 106:45 (4th ed. Dec. 2020 update). At issue here is Peters' request for "other statutory relief" on behalf of herself, the Plan, and the class members. In her complaint, Peters requested that the district court:

> Issue equitable and injunctive relief under ERISA to remedy [Appellees'] past and ongoing violations of ERISA and breaches of fiduciary duty, including but not limited to enjoin further misconduct, requiring [Appellees] to issue accurate EOBs, restoring of monetary losses to self-insured plans and insureds, including interest, imposing a surcharge for the improper gains

13

obtained in breach of [Appellees'] duties, and removal of [Appellees] as administrators of the plans[.]

J.A. 58

Under ERISA's civil enforcement scheme in § 502, Peters requests "declaratory relief, surcharge, restitution, and disgorgement, relief for the plans that were victimized, and other equitable remedies." Appellant's Br. 55. Peters characterizes these claims as seeking (1) "to enforce her rights under the terms of the plan" under § 502(a)(1)(B); (2) "appropriate equitable relief on behalf of the Mars Plan" under § 502(a)(2); and (3) "appropriate equitable relief to redress violations of ERISA and the terms of the plan, and to enforce any provisions of ERISA and the terms of the plan" under § 502(a)(3). Appellant's Br. 11.

Section 502(a)(1) generally involves "wrongful denial of benefits and information," *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996), and authorizes a civil action by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights for future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

Separately, § 502(a)(2) specifically "allow[s] for a derivative action to be brought by a . . . 'participant' on behalf of the plan to obtain recovery for losses [under § 409[8]]

---

[8] Section 409 establishes liability for breaches of fiduciary duties, stating,

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the

sustained by the plan because of breaches of fiduciary duties." *In re Mut. Funds Inv. Litig.*, 529 F.3d 207, 210 (4th Cir. 2008). Any recovery under § 502(a)(2) would go to the Plan, as "a plan participant may *not* sue under ERISA § 502(a)(2) *unless* [s]he seeks recovery on behalf of the plan." *Wilmington Shipping Co. v. New Engl. Life Ins. Co.*, 496 F.3d 326, 334 (4th Cir. 2007); *see Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985) (holding that a participant's action filed pursuant to ERISA § 502(a)(2) must seek remedies that provide a "benefit [to] the plan as a whole").

Finally, § 502(a)(3) permits a civil action

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). This "catchall" provision "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity Corp.*, 516 U.S. at 512.

Pursuant to § 502's provisions, Peters makes four primary claims for herself, the Plan, and the class members: restitution, surcharge, disgorgement, and declaratory and injunctive relief. In her request for restitution, which is a "remedy traditionally viewed as 'equitable,'" *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 252, 255 (1993), Peters asks for the "restor[ation] of . . . monetary losses to self-insured plans and insureds," J.A. 58. We have

---

plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

15

held that "[t]o establish a right to equitable restitution under ERISA, claimants must show that they seek to recover property that (1) is specifically identifiable, (2) belongs in good conscience to the plan, and (3) is within the possession and control of the defendant." *Ret. Comm. of DAK Ams. LLC v. Brewer*, 867 F.3d 471, 479 (4th Cir. 2017) (citing *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 362–63 (2006)).

Peters also petitions for surcharge of the Appellees. The Supreme Court has recognized surcharge as a form of "appropriate equitable relief" available under § 502(a)(3) because it was "typically available in equity." *CIGNA Corp. v. Amara*, 563 U.S. 421, 439, 441–42 (2011) (quoting *Sereboff*, 547 U.S. at 361). Specifically, courts of equity utilized this remedy "to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *Id.* at 441–42. Here, Peters requests the "impos[ition] [of] a surcharge for the improper gains obtained in breach of [Appellees'] duties," J.A. 58, presumably in the amount that the Plan and she (or other participants) expended as a result of Appellees' alleged breach of fiduciary duties, *see McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 181 (4th Cir. 2012) ("[The plaintiff] contends that she, as the beneficiary of a trust, is rightfully seeking to surcharge the trustee [MetLife] in the amount of life insurance proceeds lost because of that trustee's breach of fiduciary duty." (citation and internal quotation marks omitted)).

Next, Peters asks that Appellees be made to disgorge any improper gains obtained from their breach of fiduciary duties. J.A. 58. Unlike restitution's focus on making the victim whole, "[d]isgorgement wrests ill-gotten gains from the hands of a wrongdoer. It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs.

16

Disgorgement does not aim to compensate the victims of the wrongful acts[.]" *S.E.C. v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) (internal citations omitted). And looking to trust law, which provides valuable context to the ERISA scheme, disgorgement may be proper even if the breach of fiduciary duty is inadvertent or caused no loss to the trust beneficiary. *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 416 n.5 (3d Cir. 2013); George G. Bogert et al., *The Law of Trusts and Trustees* § 862 (rev. 2d ed. June 2020 update) ("[A] rule of damages provides that a trustee is liable for any profit he has made through his breach of trust even though the trust has suffered no loss.").

Finally, as to declaratory and injunctive relief, Peters requests "injunctive relief under ERISA to remedy [Appellees'] past and ongoing violations of ERISA and breaches of fiduciary duty, including but not limited to enjoin further misconduct, [and] requiring [Appellees] to issue accurate EOBs." J.A. 58. Trust law recognizes that an injunction may be proper "[i]f the beneficiary can show that an act contemplated by the trustee or a third person would amount to a breach of trust or otherwise prejudice the beneficiary." Bogert et al., *supra*, § 861. On this basis, ERISA authorizes the issuance of injunctions in order to grant "appropriate equitable relief" to aggrieved plaintiffs. *Pell v. E.I. DuPont de Nemours & Co. Inc.*, 539 F.3d 292, 306 (3d Cir. 2008); *see Mertens*, 508 U.S. at 256 (identifying injunctions as a "categor[y] of relief that w[as] typically available in equity"). Accordingly, if an injunction request is found to be equitable and not legal in nature, a court may enjoin a practice that constitutes an ERISA violation. *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210–11 (2002) (distinguishing between equitable and legal injunctive relief in the ERISA context).

B.

With this ERISA foundation in mind, we first consider Peters' Article III standing. Although only facially contesting the merits of Peters' claims when challenging the legitimacy of any financial injury, Appellees cite *Pender v. Bank of America Corp.*, 788 F.3d 354 (4th Cir. 2015), a case that expressly considered the injury-in-fact requirement of standing. The parties make no particular attempts to distinguish between their arguments on financial injury in the context of standing as opposed to on the merits.

We are cognizant of the close connectedness of Peters' theory of financial injury to her Article III standing and the merits of some of her claims. But these inquiries remain separate and distinct even if the evaluations overlap under similar facts. *Green v. City of Raleigh*, 523 F.3d 293, 299 (4th Cir. 2008) ("[A] plaintiff's standing to bring a case does not depend upon his ultimate success on the merits underlying his case[.]" (citation omitted)); *see also Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1280 (11th Cir. 2001) ("[Standing] is a threshold determination that is conceptually distinct from whether the plaintiff is entitled to prevail on the merits."). Only if Peters has standing do we address her claims on the merits.

Addressing the injury-in-fact requirement of Article III standing,[9] Appellees assert that Peters did not suffer a financial loss and therefore cannot show injury to pursue the relief requested. However, we are satisfied that, at a minimum, Peters demonstrates a financial injury sufficient to establish standing so as to proceed with her restitution claim.

---

[9] The other requirements for Article III standing—causation and redressability—are not at issue. *See Pender*, 788 F.3d at 367.

18

And even assuming *arguendo* that she could not show such an injury for standing purposes for those claims, she could still seek surcharge, disgorgement, and declaratory and injunctive relief.

1.

Restitution is a form of relief to "make-whole" the plaintiff. *Perelman v. Perelman*, 793 F.3d 368, 373 (3d Cir. 2015). While generally equitable in nature, it is directly tied to remedying a financial injury. Here, Peters requests restitution to "restor[e] . . . monetary losses to self-insured plans and insureds." J.A. 58. In simple terms, Peters seeks return of amounts she contends that she and the Plan paid by reason of Appellees' alleged breach of a fiduciary duty.

To demonstrate financial injury, Peters argues that she suffered an economic loss due to Appellees' breach of various fiduciary duties because she was required to pay in excess of her participant responsibility according to the terms of the Plan. That is, Peters contends that she paid more than the health care provider's Negotiated Charge as set by the Plan because she also paid Optum's administrative fee contained in the bundled rate. Appellees respond that, reviewing all of Peters' benefits claims in a given calendar year, she would have been worse off had they charged Peters the health care provider's Negotiated Charge rather than Appellees' bundled rate. Said another way, Appellees contend that taking Peters' claims in the aggregate for a given year show she actually saved money, or broke even, despite use of the bundled rate. The district court agreed with the result sought by Appellees, although under a somewhat different rationale, and concluded that Peters failed to "demonstrate[] how she could have possibly suffered any injury from

19

EOB statements documenting health care transactions that, on balance, saved her money."
J.A. 3235.

We, however, are persuaded that Peters suffered a financial injury sufficient to establish an injury-in-fact for the purposes of Article III standing. Our conclusion turns on the determination that the financial loss analysis must be conducted at the individual claims level rather than at the aggregate claims level. This is so because—in the context of standing, as opposed to the merits—the fact that Peters may have benefitted from the determination of certain claims does not offset the fact that she was harmed by others. *See* 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3531.4 (3d ed. Oct. 2020 update) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury.").[10]

---

[10] *See also, e.g.*, *Aluminum Co. of Am. v. Bonneville Power Admin.*, 903 F.2d 585, 590 (9th Cir. 1989) (concluding that the plaintiff utility companies "d[id] allege an injury: excessive electricity rates[.] There is harm in paying rates that may be excessive, no matter what the [plaintiff utility companies] may have saved"); *Almonor v. BankAtlantic Bancorp, Inc.*, No. 07-61862-CIV, 2009 WL 8412125, at *5 (S.D. Fla. July 15, 2009) ("While it may be true that Defendants' alleged breaches actually conferred a net benefit on Plaintiff, that fact is irrelevant to whether Plaintiff suffered an injury-in-fact or whether Plaintiff suffered a compensable loss under ERISA."); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 657 (9th Cir. 2011) ("[S]o long as [the plaintiff] can point to some concrete harm logically produced by [the regulation at issue], it has standing to challenge the [regulation at issue] even though in a prior, current, or subsequent fiscal year it may also have enjoyed some offsetting benefits from the operation of the current regulation."); *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208, 223 (3d Cir. 2013) ("A plaintiff does not lose standing to challenge an otherwise injurious action simply because he may also derive some benefit from it. Our standing analysis is not an accounting exercise[.]"), *abrogated on other grounds by Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).

Applying this principle, Peters has shown that combining Optum's administrative fee with the provider's Negotiated Charge via the bundled rate caused her to pay more on certain individual claims than she otherwise would have had to pay under the Plan's terms, therefore causing a financial injury sufficient to establish an injury-in-fact for Article III standing purposes. As her July 16, 2014 claim illustrates, for instance, Aetna determined that Peters owed 20% of the $70.89 charge for the bundled rate ($14.18), while the Plan owed the remaining 80% ($56.71). In contrast, had the Plan's responsibility framework been applied based on the health care provider's Negotiated Charge of $34 alone, both Peters and the Plan would have owed somewhat less on this specific claim: Peters would have owed 20% of $34 ($6.80 instead of $14.18) and the Plan would have owed the remainder of $27.20 instead of $56.71. As discussed in depth below, a reasonable factfinder could conclude, based on the summary judgment record, that this was an overcharge as to Peters and the Plan in violation of the terms of the Plan. The record reflects that similar overpayments occurred in some of Peters' other claims. Because Peters has adequately demonstrated that she and the Plan suffered a financial injury, she has satisfied the injury-in-fact requirement for Article III standing. She may thus proceed with her claim for restitution on the merits.

2.

Even if Peters failed to demonstrate a financial injury for standing purposes as to the restitution claim, her allegations revolving around breach of fiduciary duty would separately provide her standing to pursue claims for surcharge, disgorgement, and declaratory and injunctive relief. Peters requests "surcharge for the improper gains

21

obtained in breach of [Appellees'] duties," disgorgement of any improper gains obtained from their alleged breach of fiduciary duties, and injunctive relief "to remedy [Appellees'] past and ongoing violations of ERISA and breaches of fiduciary duty, including but not limited to enjoin further misconduct, [and to] require[] [Appellees] to issue accurate EOBs." J.A. 58. *Pender* guides our analysis here. 788 F.3d 354.

In *Pender*, we explained that Article III standing for a disgorgement claim under ERISA revolves around whether a plaintiff's "legally protected interest" has been harmed. *Id.* at 366. Specifically, we determined that "a financial loss [was] not a prerequisite for [Article III] standing to bring a disgorgement claim under ERISA." *Id.* at 365–66 (second alteration in original) (quoting *Edmonson*, 725 F.3d at 417). We reasoned that this precept was fundamental in the disgorgement context because "[r]equiring a financial loss for disgorgement claims would effectively ensure that wrongdoers could profit from their unlawful acts as long as the wronged party suffers no financial loss." *Id.*

As described in *Pender*, apart from exhibiting harm to a "legally protected interest," which Peters has done based on her breach of fiduciary duty arguments, she need not demonstrate a personal financial loss to establish standing to request disgorgement of improper gains. *See id.* at 365–66 ("[A] financial loss is not a prerequisite for [Article III] standing to bring a disgorgement claim under ERISA. . . . [I]t goes without saying that the Supreme Court has never limited the injury-in-fact requirement to financial losses (otherwise even grievous constitutional rights violations may well not qualify as an injury). Instead, an injury refers to the invasion of some 'legally protected interest' arising from constitutional, statutory, or common law." (internal quotation marks omitted)).

22

Similarly, identifying a financial injury is unnecessary to establish standing for surcharge and declaratory and injunctive relief. As *Amara* explained, equity courts could permit surcharge "to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, *or* to prevent the trustee's unjust enrichment." 563 U.S. at 441–42 (emphasis added); Restatement (Third) of Trusts § 95 cmt. b (2012) ("If a breach of trust causes a loss . . . , the beneficiaries . . . may have the trustee surcharged for the amount necessary to compensate fully for the consequences of the breach. Alternatively, the trustee is subject to such liability as may be necessary to prevent the trustee from benefiting individually from the breach of trust." (internal citations omitted)); *see also Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir. 2012) (explaining that ERISA beneficiaries can obtain surcharge under either an unjust enrichment theory or loss theory); *Morrissey v. Curran*, 650 F.2d 1267, 1282 (2d Cir. 1981) ("If a trustee was acting in his own interest in connection with performing his duties as a trustee, he was held accountable for any loss to the estate or any profit he made[.]"). Peters proceeds under the unjust enrichment theory. J.A. 58; *see* Restatement (Third) of Trusts § 100 cmt. c (2012) ("A trustee who commits a breach of trust normally is not allowed to benefit individually from the breach, and the trustee is subject to liability to eliminate any such benefit."). And a claim for surcharge under an unjust enrichment theory requires no showing of financial injury, but rather a benefit accrued by one or both of the Appellees, which Peters sufficiently demonstrates based on her claim that Aetna bypassed its obligation to pay Optum's administrative fee. *See Skinner*, 673 F.3d at 1167 (declining to surcharge the defendant under the unjust enrichment theory where the plaintiffs "presented

23

no evidence that the [defendant] gained a benefit by failing to ensure that participants received an accurate SPD"); *see also, e.g.*, *Amara v. CIGNA Corp.*, 925 F. Supp. 2d 242, 260 (D. Conn. 2012) ("In weighing unjust-enrichment surcharge, the question is whether, but for CIGNA's [breach of fiduciary duty], CIGNA would not have obtained the cost savings that it did."), *aff'd*, 775 F.3d 510 (2d Cir. 2014); *Malbrough v. Kanawha Ins. Co.*, 943 F. Supp. 2d 684, 698 (W.D. La. 2013) (discussing the defendant's improper benefits in the context of an unjust enrichment theory for surcharge).

And as the Sixth Circuit recognized in the context of plaintiffs seeking declaratory, injunctive, and other equitable relief under ERISA, "Plaintiffs need not demonstrate individualized injury to proceed with their claims for injunctive relief under § [502](a)(3); they may allege only violation of the fiduciary duty owed to them as a participant in and beneficiary of their respective ERISA plans." *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 610 (6th Cir. 2007). Peters meets this standard by enumerating the fiduciary duties she contends were owed to her and the Plan and Appellees' subsequent violation of those duties. Accordingly, even without a personal financial injury, Peters has standing to maintain her claims for surcharge, disgorgement, and declaratory and injunctive relief based on her allegations of breach of fiduciary duty.[11]

---

[11] The record appears to indicate that Peters is no longer a Plan participant, J.A. 2046, which raises a question on prospective injunctive relief because she may not be able to rely on only past conduct to establish Article III standing, *see Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018). Considering the tangential nature of this point for the purposes of our discussion on the requisiteness of establishing a financial injury and that the parties have not raised this issue on appeal, we leave consideration of this matter for the district court's resolution in the first instance upon remand.

That Peters is not only suing as an individual participant, but also on behalf of the Plan under § 502(a)(2) does not alter this conclusion. "Courts have recognized that a plaintiff with Article III standing may proceed under § [502](a)(2) on behalf of the plan or other participants." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009). And "[s]ince [Peters] has standing under Article III, we conclude that § [502](a)(2) provides h[er] a cause of action to seek relief for the entire Plan." *Id.* Peters "has alleged injury in fact that is causally related to the conduct [s]he seeks to challenge on behalf of the Plan." *Id.* In other words, Peters "has a personal stake in the litigation" because her requested relief "will stand or fall with that of the Plan." *Id.*; *see Wilmington Shipping Co.*, 496 F.3d at 335 ("[The plaintiff's] injury is no less concrete because the benefit to him from a favorable outcome in this litigation would derive from the restored financial health of the Plan.").

C.

Satisfied that Peters has Article III standing, we proceed to the assessment of her claims on the merits. For purposes of this Section C, we address only her claim for restitution. In that regard, we assume that Peters produced sufficient evidence for a reasonable factfinder to conclude that (1) Aetna was operating as an ERISA fiduciary and that its complaint-related actions amounted to a breach of fiduciary duty; and (2) Optum was either an ERISA fiduciary or party in interest involved in prohibited transactions. Peters' claims for surcharge, disgorgement, and declaratory and injunctive relief are addressed separately below in Section D, wherein Appellees' ERISA fiduciary status and breach of any fiduciary duty are considered on the merits. *See infra* § II.D.

Unlike Peters' claims based on surcharge, disgorgement, and declaratory and injunctive relief that do not require a showing of personal financial harm, her claim for restitution requires such financial loss in order to establish compensable injury on the merits. As discussed below, we find that Peters failed to show such an injury, meaning that her individual claim for restitution under § 502(a)(1) and (3) fails. However, we are unable to conduct the necessary appellate review as to whether Peters' claims for restitution on behalf of the Plan would succeed or fail to survive the motions for summary judgment. Said another way, we cannot determine from this record whether there is sufficient evidence to determine if the Plan sustained a financial injury, so we must remand this question and the corresponding inquiry on the Plan's entitlement to restitution under § 502(a)(2) to the district court for a determination in the first instance.

1.

As noted, Peters asserts that she suffered an economic loss due to Appellees' actions because she was required to pay in excess of her health care provider's Negotiated Charge contrary to the terms of the Plan. In effect, Peters asserts that Appellees should have charged her for only the health care provider's Negotiated Charge under the Plan, not the Negotiated Charge combined with the cost of Optum's administrative fee via the bundled rate. Specifically, she claims she sustained a direct personal loss for excess coinsurance payments totaling $151.42, while the Plan made excess payments for Peters' claims in the amount of $1,020.96. Appellees seek to undermine the entirety of Peters' claims by asserting that she suffered no financial loss, but in fact experienced a financial gain when all of her health care claims for a given year are considered in the aggregate.

26

In *Donovan v. Bierwirth*, the Second Circuit looked to trust law for guidance in order to determine the proper measure of damages under ERISA for breach of a fiduciary duty. 754 F.2d 1049 (2d Cir. 1985). In that case, pension plan trustees purchased stock in the parent corporation with plan assets to help defeat a tender offer on the parent corporation's stock. *Id.* at 1051. Later, they resold the stock at a profit. *Id.* Plaintiffs asserted that the trustees' purchase of the stock on behalf of the Plan was for an improper purpose and constituted a breach of fiduciary duty, and sought injunctive relief, appointment of a receiver, and recoupment of the plan's losses. *Id.* The district court determined that it would "tak[e] evidence on the issue of loss to the Plan before taking additional evidence on the question of breach of duty," *id.*, ultimately concluding that the plan had not sustained a loss, *id.* at 1051–52.

On appeal, assuming a breach of fiduciary duty had occurred to resolve the question of loss, the Second Circuit advised that, for purposes of damages, "[o]ne appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." *Id.* at 1056 (citing Restatement (Second) of Trusts § 205(c) (1959)). Following this guidance, the court held that "the measure of loss applicable . . . requires a comparison of what the Plan actually earned on the . . . investment with what the Plan would have earned had the funds been available for other Plan purposes." *Id.* "If the latter amount is greater than the former, the loss is the difference between the two; if the former is greater, no loss was sustained." *Id.* The Second Circuit then remanded on the question of loss, so that the district court could

make findings of fact based on the actual transaction amounts in order to determine if a loss was sustained by the Plan. *Id.* at 1058.

Many of our sister circuits have found *Donovan's* trust-law-based formula instructive and have followed it.[12] We also find *Donovan* instructive and follow its principles here. Accordingly, the measure of loss applicable in an ERISA trust circumstance like this case requires a comparison of what Peters or the Plan would have paid had Peters' claims excluded Optum's administrative fee with what they actually paid on those claims. *See* Morgan, *supra*, § 106:44 ("[C]ourts are not restricted to a single method of computing the losses. If courts are uncertain about computing the amount of the award, courts may refer to the common law of trusts and enforce whichever remedy is 'most advantageous to the participants and most conducive to effectuating the purposes of the trust.'" (quoting *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir. 1978))). Correspondingly, if what Peters and the Plan actually paid on Peters' claims is less than—or equal to—what they would have paid had Peters' claims excluded Optum's administrative fee, no loss was sustained. *Donovan*, 754 F.2d at 1056.

---

[12] *Perez v. Bruister*, 823 F.3d 250, 265 (5th Cir. 2016) (noting *Donovan*'s approach "to compute overpayments"); *Peabody v. Davis*, 636 F.3d 368, 373 (7th Cir. 2011) (quoting *Donovan's* measure of loss framework); *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007) (favorably citing *Donovan*'s loss model); *Shade v. Panhandle Motor Serv. Corp.*, 91 F.3d 133, 1996 WL 386611, at *4 (4th Cir. 1996) (unpublished table decision) (per curiam) (referencing *Donovan* for the principle of restoring the plaintiff "to the position he would have occupied but for [the defendant's] breach of its fiduciary duty"); *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 603 (8th Cir. 1995) ("We have favorably cited *Donovan* for the measure of loss in a stock manipulation case, and have approved a district court case that relied extensively on. *Martin v. Feilen*, 965 F.3d 660, 671 (8th Cir. 1992), *cert. denied*, 506 U.S. 1054 (1993). We believe that *Donovan* provides the appropriate analysis of the measure of loss in a case such as this.").

This *Donovan* framework demonstrates that the district court failed in some respects to apply a proper standard when conducting its review based on the hypothetical nonexistence of the Aetna-Optum relationship. Nonetheless, Peters is equally incorrect in asserting that offsetting losses with gains is erroneous in a merits analysis (irrespective of standing). In effect, Peters wants relief where the *Donovan* framework helps her, but wants to ignore it when that same framework shows she actually had a gain or broke even.

Considering the *Donovan*-based formula and offsetting Peters' losses with the gains she experienced on all her healthcare claims under the Plan, it becomes apparent from the undisputed evidence that she suffered no direct financial injury from Appellees' actions. Therefore, her individual claim for restitution under § 502(a)(1) and (3) cannot be sustained. For this reason, despite our disagreement with the district court's explanation on how it arrived at its conclusion, we affirm the district court's grant of summary judgment to Appellees on this discrete claim.

2.

Beginning with the district court's assessment of financial injury, it did not analyze loss in line with the *Donovan* framework. Rather, it compared what Peters and the Plan paid on Peters' claims with "a world where the challenged agreements were not entered into in the first place," a model which has no nexus to the ERISA breaches alleged. J.A. 2728. In other words, the district court assumed a scenario in which "Aetna plans and participants would be subject to the rates that Aetna charged prior to its contractual arrangement with Optum." J.A. 2728. On this basis, the district court often referenced its belief that Peters was not harmed, considering "*all the claims* incurred by the participant

in any given plan year, including those for which the participant benefited as well as those for which the participant was allegedly harmed." J.A. 2731. In doing so, the district court concluded that Peters experienced no direct financial injury, but rather a net gain, as a result of the lower health care provider rates that Optum brought to the Plan participants as opposed to what Aetna alone would have charged. Although the district court erred in focusing on a hypothetical construct unrelated to the claims alleged based on the bundled rate scheme, we come to the same result under *Donovan*.

The district court's focus on a hypothetical scenario in which the Aetna-Optum relationship did not exist fails to grasp the actual conduct and ERISA fiduciary violations Peters alleged. As indicated above, the measure of loss requires a comparison of what Peters and the Plan would have paid had her claims excluded Optum's administrative fee and what they actually paid per the bundled rate. On this particular point then, we agree with Peters' contention that the district court erred in comparing what she and the Plan actually paid with what they would have paid had the Aetna-Optum relationship not existed. As Peters explained, her contention was never "that the 'Aetna-Optum contractual arrangement' was itself illegal. Rather, she brought ERISA claims challenging Aetna's repeated self-serving benefit determinations charging her and her plan for Optum's fees in the guise of medical expenses." Appellant's Br. 34.

However, Peters' proffered damages model also misses the mark because she essentially asks that we disregard her total claims under the Plan, which would include all her health care expenses, not just those from Optum. Instead, Peters wants to focus exclusively on the claims in which she suffered a financial loss via the bundled rate. Trust

law does not support this approach, and instead instructs that offsetting gains and losses is appropriate where the misconduct in question "constitute[s] a single breach." Restatement (Third) of Trusts § 101 (2012) ("The amount of a trustee's liability for breach of trust may not be reduced by a profit resulting from other misconduct unless the acts of misconduct causing the loss and the profit constitute a single breach."). To determine whether a single breach occurred, the Third Restatement offers the following factors, indicating that the first factor is "likely to be of particular significance":

> (1) Whether the improper acts are the result of a single strategy or policy, a single decision or judgment, or a single set of interrelated decisions;
>
> (2) The amount of time between the instances of misconduct and whether the trustee was aware of the earlier misconduct and its resulting loss or profit;
>
> (3) Whether the trustee intended to commit a breach of trust or knew the misconduct was a breach of trust; and
>
> (4) Whether the profit and loss can be offset without inequitable consequences, for example to beneficiaries having different beneficial interests in the trust.

*Id.* § 101 cmt. c.

Again, assuming only for purposes of this Section C that (1) Aetna was a fiduciary and breached its fiduciary duty and (2) Optum was either a fiduciary or party in interest engaged in prohibited transactions, the evidence before us only permits the conclusion that Appellees' actions constituted a single breach primarily under the first factor of the Restatement. Accordingly, offsetting gains and losses—*i.e.*, considering *all* of Peters' health care claims for a given calendar year—is the appropriate measure to assess whether she incurred any losses. *See* Bogert, *supra*, § 862 ("Where the profit and loss arise from breaches of trust that are not separate and distinct but are regarded as a single breach, the

31

trustee is liable only for the net loss[.]"). Here, the breach originated and occurred based on a "single strategy or policy"—that being Aetna's agreement with Optum to bundle Optum's administrative fee utilizing the dummy CPT code. Restatement (Third) of Trusts § 101 cmt. c. In contrast to the earlier discussion on standing, which focused on an assessment of Peters' asserted financial injury arising from discrete individual claims, trust law principles direct that we offset all applicable gains and losses in adjudicating the full claim on the merits.

To do so, we follow the *Donovan*-based formula to quantify what Peters and the Plan would have paid if her claims excluded Optum's administrative fee. That is to say, keeping in mind the Plan's responsibility framework, Peters' liability for a claim was the amount described in the SPD: the "Negotiated Charge," defined as "the maximum charge a Network Provider has agreed to make as to any service or supply for the purpose of the benefits under this Plan." J.A. 3067. For every claim in a given year, we then consider the health care provider's Negotiated Charge, the actual charge, and the Plan responsibility framework. Although straightforward to state, it is a bit more difficult in application.

To follow the *Donovan* framework, we begin by considering Peters' deductible payments, which depended on the total health care expenses she incurred in any given calendar year. Specifically, the Plan required Peters to pay 100% of covered expenses until she met her deductible of $250—"[t]he part of [her] Covered Expenses [she] pa[id] each calendar year before the Plan start[ed] to pay benefits." J.A. 3063. After reaching the deductible, she was then responsible for paying 20% of the covered expenses as coinsurance—"[t]he amount [Peters] pa[id] for Covered Expenses after [she] . . . met the

32

annual deductible," J.A. 3064—with the Plan paying the other 80%. Once Peters met the annual coinsurance maximum of $1,650—"[t]he amount of Coinsurance [she] pa[id] each year before the Plan pa[id] 100% of the Negotiated Charge (for in-network services)," J.A. 3063—the Plan paid 100% of the covered expenses. We therefore proceed to compare the amounts that Peters and the Plan would have paid for health care services under the Plan's terms (the Negotiated Charge) with the sums that were actually paid (under Appellees' bundled rate). This process determines whether Peters or the Plan had a net "gain," "loss," or no change. In other words, we assess whether Peters and the Plan suffered a loss in the aggregate or experienced a gain based on all of her claims in each year. We conduct this analysis separately as to Peters and the Plan to determine if either, irrespective of the other, suffered a financial loss.

Although, as noted, we disagree with the district court's reasoning, we affirm the grant of summary judgment to Appellees as applied to Peters because she failed to demonstrate that she suffered the required financial injury for purposes of restitution. Applying the *Donovan* formula to Peters' total claims reflects that she would have paid more each year, or broken even, if she had only paid the health care provider's Negotiated Charge as opposed to what she paid in the aggregate under the bundled rate. While this seems counterintuitive, the mechanics of the Plan's coinsurance and deductible structure direct this result. In particular, Peters seeks to treat the bundled rate charges in isolation. She wishes to include only the Optum chiropractic and physical therapy care claims, but ignore all her other health care expenses even though these applied to the deductible and coinsurance and were *not* subject to the bundled rate.

33

In this regard, we find the report of Appellees' expert, Dr. Daniel Kessler, to be instructive and a useful application of *Donovan*. Dr. Kessler analyzed Peters' claims by comparing what Peters would have paid each year in the aggregate had her claims excluded Optum's administrative fee (*i.e.*, had she been charged only her health care provider's Negotiated Charge) with what she actually paid on her claims. In doing so, Dr. Kessler showed that Peters' "gains" exceeded any "losses" or she broke even.

As to Peters' claims accrued in 2013, Dr. Kessler applied the Plan's responsibility framework to those claims and determined that even if they had been based solely on her health care provider's Negotiated Charge, she would have "experienced zero economic impact—neither net harm nor net benefit." J.A. 5879; *see* J.A. 5915–16 (detailing Dr. Kessler's calculations on Peters' claims from 2013). In doing so, Dr. Kessler explained that Peters "reached her Out-of-pocket maximum in the actual world and would reach it [if she were charged only the Negotiated Charge of the health care providers]. She was responsible for the maximum amount in Coinsurance required by her Plan in both scenarios." J.A. 5879. So, "she was [r]esponsible for exactly the same amount in the actual world as she would be [if she had been charged only the Negotiated Charge]." J.A. 5879.

For 2014, Dr. Kessler calculated that Peters actually experienced a net gain of $114.71, meaning that if her claims had been based solely on her health care provider's Negotiated Charge, she would have paid $114.71 more than she paid in actuality. Specifically, Dr. Kessler's analysis showed that Peters' actual participant responsibility totaled $1,785.29 in 2014, while her total participant responsibility would have been $1,900 in that same year had she been solely charged her health care provider's Negotiated

34

Charge. *See* J.A. 5919–21 (detailing Dr. Kessler's calculations on Peters' claims from 2014). The difference between these two figures makes up the net gain of $114.71.

The manner in which Peters' claims were applied to meet her deductible of $250 accounts for this difference. In short, if Peters' claims had been based just on her health care provider's Negotiated Charge, she would have met her deductible by paying the full $250. However, in actuality, Peters met her $250 deductible by paying only $135.29 in participant responsibility. As Dr. Kessler's analysis shows, Appellees charged a bundled rate of $70.89 to Peters' first four relevant claims in 2014, but only required her to pay a portion of that rate while nonetheless applying the full value of the bundled rate towards her $250 deductible. *See* J.A. 5919. For instance, as to Peters' first claim in 2014, Appellees charged a bundled fee of $70.89, but Peters only paid $36 in participant responsibility. *Id.* Nonetheless, Appellees credited the full $70.89 bundled rate towards her $250 deductible––resulting in a $34.89 deductible-credit windfall to Peters. *See id.* Conversely, under Peters' theory, she would have had to pay the entire deductible sum of $250 without the assistance of the bundled rate inflating her ability to meet that figure.

Accordingly, based on the actual calculation of Peters' deductible, Dr. Kessler concluded that Peters "Pays Less" in 2014 in the amount of $114.71. *Id.* The impact of this analysis shows that the higher bundled rate amount credited to Peters' deductible (while only holding her accountable out-of-pocket for the health care provider's Negotiated Charge) caused her to meet her deductible faster (and correlated to less participant responsibility). By contrast, lower claims based on just the health care provider's Negotiated Charge would have delayed her ability to meet her deductible (and would have

35

indicated greater participant responsibility).[13] Peters offered no direct rebuttal evidence to Dr. Kessler's analysis in this regard.

In sum, we agree with Dr. Kessler's analysis that Peters avoided paying "greater participant responsibility" in the amount of $114.71 for 2014 and had no net loss in either 2013 or 2015 when all of her health care claims are considered. Therefore, Peters experienced no direct financial injury (but rather a net gain) based on the bundled rate scheme in the aggregate. Accordingly, the district court reached the correct result in granting summary judgment to Appellees on Peters' individual request for restitution under § 502(a)(1) and (3), which relies on a demonstration of financial injury.

While the foregoing resolves Peters' claims for personal financial loss, the record is otherwise silent as to what gain or loss the Plan incurred utilizing the *Donovan* framework for the restitution claim. We are therefore unable to conduct appellate review of the district court's judgment as to Peters' claim on behalf of the Plan. As such, we find it appropriate to vacate the district court's grant of summary judgment to Appellees on this claim and remand the matter to the district court to develop a fuller record of the relevant financial facts, if necessary, and determine the Plan's financial injury for restitution purposes, if any, in the first instance.

Under *Donovan*, if the district court finds that the Plan sustained a financial injury, then restitution may be an available remedy for the Plan under § 502(a)(2). *See Amara*, 563

---

[13] As to Peters' claim in 2015, we briefly note that Dr. Kessler determined Peters experienced no harm because she "had one Optum claim for which she was Responsible for the Optum Downstream rate of $36.00," J.A. 5884, meaning it was already based on the Negotiated Charge. Peters did not rebut this evidence.

U.S. at 441–42. Correspondingly, if the district court determines that the Plan did not suffer an economic loss, then summary judgment in favor of Appellees as to a restitution claim would be appropriate. Accordingly, we affirm the district court's judgment on Peters' personal claim for restitution under § 502(a)(1) and (3), but vacate and remand to the district court this claim under § 502(a)(2) as to the Plan for examination in the first instance under *Donovan*.

D.

We next address the remaining merits issues concerning Peters' request for surcharge, disgorgement, and declaratory and injunctive relief under § 502(a)(1) and (3). We proceed by considering, "first, whether [Aetna] was an ERISA fiduciary, and second, whether [Aetna's] action amounted to a breach." *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 865 (6th Cir. 2013). And we conclude that Peters has produced sufficient evidence to create genuine disputes of material fact that affect the requested relief of surcharge, disgorgement, and declaratory and injunctive relief so as to survive the motions for summary judgment. In doing so, we conduct a party-specific analysis as to Aetna and later consider Optum's separate liability.

ERISA recognizes two types of fiduciaries, named and functional. A party that is designated "in the plan instrument" as a fiduciary is a "named fiduciary." 29 U.S.C. § 1102(a)(2). A "functional" fiduciary is defined as:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other

37

property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*Id.* § 1002(21)(A). Under ERISA's functional fiduciary standard, "being a fiduciary under ERISA is not an all-or-nothing situation." *Gordon v. CIGNA Corp.*, 890 F.3d 463, 474 (4th Cir. 2018) (citing *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61–62 (4th Cir. 1992)). Rather, whether a party functions as a fiduciary is determined "with respect to the particular activity at issue" because an entity functions as a fiduciary "to the extent" it performs a particular function. *Coleman*, 969 F.2d at 61 (quoting 29 U.S.C. § 1002(21)(A)). "Thus, an entity can be a fiduciary for some activities and not others." *Gordon*, 890 F.3d at 474.

ERISA requires fiduciaries to abide by the general duties of loyalty and care that are firmly rooted in the common law of trusts. *See Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570–71 (1985); *see also* Restatement (Third) of Trusts §§ 77–78. Specifically, ERISA imposes three broad duties on ERISA fiduciaries: (1) the duty of loyalty, which requires that "all decisions regarding an ERISA plan . . . be made with an eye single to the interests of the participants and beneficiaries"; (2) the "prudent person fiduciary obligation," which requires a plan fiduciary to act "with the care, skill, prudence, and diligence of a prudent person acting under similar circumstances"; and (3) the exclusive benefit rule, which requires a fiduciary to "act for the exclusive purpose of prov[id]ing benefits to plan participants." *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 448–49 (6th Cir. 2002) (citation and internal quotation marks omitted). In addition, ERISA prohibits self-dealing because "[a] fiduciary with respect to a plan shall

not deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). These duties also preclude a fiduciary from making "material misrepresentations and incomplete, inconsistent or contradictory disclosures" to the plan beneficiaries. *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001) (quoting *Harte v. Bethlehem Steel Corp.*, 214 F.3d 446, 452 (3d Cir. 2000)).

Liability for ERISA violations can attach in certain circumstances even if a party is not a fiduciary. Under ERISA's prohibited transaction provision,

> [a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1)(D). So, even though the plan fiduciary is the one who "cause[d] the plan to engage in a [prohibited] transaction," *id.* § 1106(a)(1), the "culpable fiduciary," beneficiary, or trustee may still bring suit against "the arguably less culpable" party in interest because "the purpose of the action is to recover money or other property for the [plan beneficiaries]," *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 252 (2000) (citation omitted).

In the context of an employee benefit plan, a "party in interest" can mean, *inter alia*, "a person providing services to such plan[.]" 29 U.S.C. § 1002(14)(B). When assessing whether an entity is a party in interest, it is necessary to determine the scope of the entity's relationship with the plan:

> [I]f a service provider has no prior relationship with a plan before entering a service agreement, the service provider is not a party in interest at the time of the agreement. . . . [I]t only becomes a party in interest after the initial

transaction occurs, and subsequent transactions are not prohibited absent self-dealing or disloyal conduct.

*Sweda v. Univ. of Pa.*, 923 F.3d 320, 337 n.12 (3d Cir. 2019). This concept of liability as a party in interest is limited, however: "[T]he transferee must be demonstrated to have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Tr.*, 530 U.S. at 251.

The lodestar to determining fiduciary or party in interest liability are the terms of the Plan, as "ERISA requires the Plan be administered as written and to do otherwise violates not only the terms of the Plan but causes the Plan to be in violation of ERISA." *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 239 (4th Cir. 2008) (citing 29 U.S.C. § 1102(a)(1)); *see also Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013) (noting "the particular importance of enforcing plan terms as written"); *White v. Provident Life & Accident Ins. Co.*, 114 F.3d 26, 28 (4th Cir. 1997) ("ERISA demands adherence to the clear language of [an] employee benefit plan."). And any changes to the Plan must be completed through a written amendment process because ERISA "does not provide for . . . unwritten modifications of ERISA plans." *White*, 114 F.3d at 29; *see* 29 U.S.C. § 1102(a)(1) (requiring that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument"); 29 U.S.C. § 1102(b)(3) (requiring that an ERISA plan describe the formal procedures by which the plan may be amended).

1.

We first consider whether Peters produced sufficient evidence to permit a reasonable factfinder to conclude that Aetna was operating as an ERISA fiduciary. Then, we assess whether her claims that Aetna's actions constituted a breach of fiduciary duty withstand summary judgment. In doing so, we consider whether Peters has come forward with sufficient evidence to proceed with her requests for surcharge, disgorgement, and declaratory and injunctive relief under § 502(a)(1) and (3).

i.

The record contains sufficient evidence to permit a reasonable factfinder to determine that Aetna was a functional fiduciary regarding many of the complaint-related actions. The district court briefly addressed its perception of Aetna's fiduciary status in its order granting summary judgment:

> [T]he Court notes that it has already recognized that Aetna served only as a limited fiduciary with respect to the Plaintiff and the Mars Plan. As the Court previously concluded, Aetna was not serving in a fiduciary capacity when it negotiated "with Optum to establish and maintain a provider network that benefitted a broad range of health-care consumers." Aetna contracted with Optum in order to lower physical therapy and chiropractic costs for Aetna plan sponsors and members generally, and this contractual relationship has proven to be successful, saving millions of dollars for both plan sponsors and members.

J.A. 3233 (internal citation omitted). As the foregoing reflects, the district court did not appear to consider whether Aetna was a named fiduciary, but did consider Aetna to act in a functional fiduciary status to an undefined degree.[14]

Peters has provided sufficient evidence for a reasonable factfinder to conclude that Aetna was operating as a functional fiduciary when it both "exercise[d] . . . discretionary authority or discretionary control respecting management of [the Plan] or exercise[d] . . . authority or control respecting management or disposition of [the Plan's] assets," and had "discretionary authority or discretionary responsibility in the administration of [the Plan]." 29 U.S.C § 1002(21)(A)(i), (iii). Moreover, under the MSA, a reasonable factfinder could find that Aetna had discretionary authority and control to spend Plan assets because "charges of any amount payable under the Plan shall be made by check drawn by Aetna[.]" J.A. 5989.

In *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, the Sixth Circuit considered functional fiduciary status on comparable facts. 751 F.3d 740 (6th Cir. 2014). Similar to the case at bar, Hi-Lex had a self-funded health benefit plan for its employees, pooling its money into a fund and then using a third-party administrator, Blue Cross Blue Shield, to manage the fund and pay claims out of the Hi-Lex plan. *Id.* at 743. In exchange for this service, Blue Cross Blue Shield received a monthly per-employee administrative

---

[14] The record is unclear as to whether Aetna qualifies as a named fiduciary. However, we decline to address this inquiry considering the district court did not resolve it and recognizing that we nonetheless reach the same end result based on our functional fiduciary analysis.

42

fee out of the Hi-Lex plan. *Id.* Unbeknownst to Hi-Lex, however, Blue Cross Blue Shield manipulated an extra fee by marking up the price of hospital services and pocketing the difference. *Id.* Hi-Lex sued, alleging that Blue Cross Blue Shield had breached its fiduciary duty under ERISA. *Id.*

The Sixth Circuit found in favor of Hi-Lex. Referring back to the statutory definition of a "fiduciary," the Sixth Circuit reasoned that Blue Cross Blue Shield had the responsibility of and control over plan assets—specifically, the funds in the Hi-Lex plan. *Id.* at 744–47. The court concluded that Blue Cross Blue Shield therefore operated as a functional fiduciary because it discretionarily imposed the unauthorized extra fee, which it then paid with Hi-Lex plan assets. *Id.* at 744–45. We are persuaded that the same principles apply in this case.

"[T]he threshold question" is whether Aetna was acting as a fiduciary "when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). The district court was mistakenly preoccupied with Aetna's role in subcontracting out to Optum some of the services it was otherwise required to provide under the MSA. But those actions are not the "action subject to complaint." Rather, Aetna's questionable construct to pay Optum's administrative fee through the bundled rate using the dummy CPT code to implement a fee-shifting scheme is the "action subject to complaint." *See* J.A. 38–42 (describing the basis of Aetna's "cost-shifting scheme" in Peters' complaint); *see also Fayeulle v. Cigna Corp.*, No. 1:15-CV-01581-JLK, 2016 WL 9752312, at *3 (D. Colo. June 29, 2016) ("The actions at the center of Plaintiffs' complaint are not Cigna's decision to contract with Columbine or ASH, determining whether Plaintiffs were entitled to

43

particular benefits, or routine processing of claims or benefit amounts, but rather Defendants' decision to charge the administrative fees Cigna owed to Plaintiffs and their plans and then generate misleading EOBs characterizing those charges as 'medical expenses.'"). It is this course of conduct that is relevant to the functional fiduciary analysis. The district court's fiduciary status analysis thus focused on the wrong conduct.

When the proper challenged conduct is considered, it is apparent that Peters produced sufficient evidence to withstand summary judgment because a reasonable factfinder could conclude that Aetna acted as a functional fiduciary by "exercis[ing] . . . discretionary authority or discretionary control respecting management of [the Plan]" and had "discretionary authority or discretionary responsibility in the administration of [the Plan]." 29 U.S.C § 1002(21)(A)(i), (iii). Indeed, a reasonable factfinder could determine that Aetna acted as such when it avoided payment of Optum's administrative fee by causing Peters and the Plan to shoulder that expense and then paid the fees out of the Plan to Optum.

Peters produced evidence to show that this course of conduct was not by happenstance. Aetna and Optum scouted for a usable CPT code that could operate as the "dummy code." Specifically, they sought to find one that was an "infrequently billed CPT code" that was "still . . . considered valid." J.A. 5605, 5610. "Aetna MA requested a proposal that buil[t] the [administrative services only] pricing into the provider fee schedule/claims process[.]" J.A. 3120. "[O]ne of Aetna's original goals of the service

44

model design was to 'bury' the admin fee within the claims process (to ensure Aetna didn't have to pay a [███████████████ fee] out of their own bank account)."[15] J.A. 2692.

A reasonable factfinder could conclude that Optum's administrative fee was therefore imposed upon Peters and the Plan at Aetna's discretion, but without authority under the Plan and in direct violation of the MSA, as discussed below. *See Pipefitters*, 722 F.3d at 867 (concluding that the defendant was a fiduciary because it "necessarily had discretion in the way it collected the funds" at issue); *Abraha v. Colonial Parking, Inc.*, 243 F. Supp. 3d 179, 186 (D.D.C. 2017) (finding that the defendant's exercise of contractual authority to change from a flat per-participant fee to a percentage-of-contributions fee was an exercise of discretion over the service provider's own compensation and therefore plausibly subjected the defendant to ERISA fiduciary obligations); *Golden Star, Inc. v. Mass Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 80–82 (D. Mass. 2014) (denying summary judgment to an insurer on the issue of whether it acted as a functional fiduciary because a reasonable jury could conclude that it was, based on its

---

[15] We note that the district court impermissibly drew an inference in favor of Aetna in regard to the "bury" language, crediting Aetna's interpretation of this wording in its order granting summary judgment in favor of Aetna: "Although some emails and notes offhandedly referred to the Aetna-Optum fee structure as 'burying' Optum's administrative fee in the claims process, Optum's Rule 30(b) corporate designee, Theresa Eichten, explained that 'burying' meant only '[t]hat Aetna requested [Optum] build [its] administrative fee into the claims process.'" J.A. 3227 (alterations in original) (citations omitted). Drawing inferences in favor of the movant is in contravention of the summary judgment standard. *See, e.g.*, *W. C. English, Inc. v. Rummel, Lkepper & Kahl, LLP*, 934 F.3d 398, 405 (4th Cir. 2019) (reaffirming that a district court "[can]not resolve genuine disputes [of fact] . . . against the nonmoving party on summary judgment"). That determination falls to the ultimate finder of fact, and the district court erred in doing otherwise at the summary judgment stage.

discretion to set a "management fee" anywhere between zero and one percent); *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co.*, 931 F. Supp. 2d 296, 304 (D. Mass. 2013) (same where insurer had discretionary authority to set a "lending fee" anywhere from zero to 50 percent). Peters' evidence was sufficient to show that Aetna's intentional implementation of the dummy CPT code/bundled rate scheme was a discretionary act that a reasonable factfinder could find gave rise to functional fiduciary status.

Bolstering our conclusion that a reasonable factfinder could determine that Aetna operated as a functional fiduciary is the record evidence that it "exercise[d] . . . discretionary authority or discretionary control respecting management or disposition of [the Plan's] assets" by directing the Plan assets to pay claims much like Blue Cross Blue Shield did in *Hi-Lex*. 29 U.S.C § 1002(21)(A)(i); *see Hi-Lex*, 751 F.3d at 744–45. Specifically, the MSA gave Aetna authority to pay claims benefits on behalf of Mars, stating,

> Plan benefit payments and related charges of any amount payable under the Plan shall be made by check drawn by Aetna . . . . [Mars], by execution of the Services Agreement, expressly authorizes Aetna to issue and accept such checks on behalf of [Mars] for the purpose of payment of Plan benefits and other related charges.

J.A. 5989. Aetna's Rule 30(b) corporate designee, Jennifer Allison Cross Hennigan, confirmed this was the regular course of business between Aetna and Mars, affirming that "Aetna was authorized to issue checks on behalf of Mars to pay plan benefits" and that "Mars also agreed to provide funds sufficient to satisfy plan benefits." J.A. 6203. "Because the power to draft checks on the plan account constitute[s] control over plan assets, [a

reasonable factfinder could determine that Aetna] qualified as an ERISA fiduciary." *Briscoe v. Fine*, 444 F.3d 478, 493 (6th Cir. 2006). We therefore conclude that Aetna was not entitled to summary judgment because Peters produced sufficient evidence for a reasonable factfinder to conclude that Aetna was operating as a functional fiduciary with respect to the Plan.

ii.

Having established that the district court erred in granting summary judgment to Aetna on the issue of fiduciary status, we turn to whether Peters produced sufficient evidence to withstand summary judgment as to Aetna's actions amounting to a breach of its fiduciary duty. We conclude that the district court's grant of summary judgment in favor of Aetna was also improper because a reasonable factfinder could conclude that Aetna breached its duties based on the following four actions regarding the EOBs: (1) referring to Optum, and not the actual health care provider, as the "provider" of the medical services; (2) using "dummy codes" that did not represent actual medical services; (3) misrepresenting the "amount billed" as including Optum's administrative fee; and (4) describing the Optum rate, which included its administrative fee, as the amount that the Plan and its participants, like Peters, owed for their claim. We address each of these in turn.

First, the EOBs referred to Optum, and not the actual health care provider, as the "provider" of the medical services. A reasonable factfinder could conclude that this was in contravention of the terms of the Plan and a breach of fiduciary duty. Agreeing with Aetna's interpretation and deeming Aetna's actions "entirely consistent with the Mars Plan," but referencing only the MSA, the district court stated:

47

Mars and Aetna had agreed in their Master Services Agreement that Aetna would "issue a payment on behalf of Customer for [in-network] services in an amount determined in accordance with the Aetna contract with the Network Provider and the Plan benefits." The Plaintiff argues that this payment should have been calculated using only the Optum [health care provider] rates. But Optum's [health care providers] are not the "Network Provider" in this context; Optum is. Optum provided the network of therapists to Aetna members. This interpretation is not only consistent with the Mars Plan's definitions of those terms, it is the only reasonable interpretation of the relevant contracts. Aetna had no contracts with Optum's [health care providers]; thus, including the individual physical therapists, chiropractors, and other treatment providers in the Master Services Agreement's definition of "Network Provider" would render that agreement's provision requiring Aetna to issue payment in accordance with its "contract with the Network Provider" meaningless.

J.A. 3234–35 (first alteration in original) (emphasis and internal citations omitted).

As a threshold matter, the district court erred in relying solely on the MSA as opposed to the SPD when interpreting the terms of the Plan. *See, e.g.*, *Kress v. Food Emps. Labor Rels. Ass'n*, 391 F.3d 563, 568 (4th Cir. 2004) ("SPDs—Summary Plan Descriptions—are required by statute to 'be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.'" (emphasis omitted) (quoting 29 U.S.C. § 1022(a)); *id.* at 568 ("We first turn to the plain language of the SPD to determine whether it in fact authorizes the Fund's actions."); *United McGill Corp. v. Stinnett*, 154 F.3d 168, 172 (4th Cir. 1998) ("[T]he plain language of an ERISA plan must be enforced in accordance with 'its literal and natural meaning.'" (quoting *Health Cost Controls v. Isbell*, 139 F.3d 1070, 1072 (6th Cir. 1997)))).

Had it properly assessed the SPD rather than the MSA, the district court would have concluded that the SPD supports Peters' position: Network Providers were the actual health

48

care providers and the Plan prohibited non-medical charges, including Optum's administrative fee, from being charged back to the Plan and its participants. Starting with the basics, a "Network Provider" is defined by the SPD as "[a] health care provider or pharmacy that has contracted to furnish services or supplies for this Plan, but only if the provider is, with Aetna's consent, included in the directory as a Network Provider." J.A. 3067. In contrast, an "Out-of-Network Provider" is "[a] health care provider or pharmacy that has not contracted with Aetna, an affiliate or a third-party vendor to furnish services or supplies for this Plan." J.A. 3067.

Based on the controlling SPD definitions, which are written "to be understood by the average plan participant," *Kress*, 391 F.3d at 568, a reasonable factfinder could determine that Optum was not a Network Provider, *see, e.g.*, *Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.*, 703 F. App'x 126, 131 (3d Cir. 2017) ("In ordinary usage, a 'health care provider' is a person or entity that is qualified to render medical care to patients. Because an administrator or manager does not render medical care, she is not, by plain definition, a provider."). Optum itself seemed to recognize as much, as evidenced by its representation that it did not provide treatment to patients.[16]

---

[16] In Theresa Eichten's deposition, Optum's Rule 30(b) corporate designee, she confirmed that Optum does not physically provide medical treatment to patients:

> Q: Did Optum, in this arrangement, provide medical treatment to patients?
>
> . . .
>
> A: No. We do not touch a patient.
> Q: Does Optum diagnose medical conditions?
> A: No, we do not.
> Q: Treat medical conditions?

This interpretation is bolstered by the brief of *amici*, the American Medical Association, North Carolina Medical Society, Maryland State Medical Society, South Carolina Medical Association, and Medical Society of Virginia. In their brief, *amici* explain that "within the health care industry, a 'provider' is one who performs a service (such as a physician) or who maintains a health care facility (such as a hospital)." *Amici* Br. 13. Accordingly, a reasonable factfinder could conclude that Optum was simply not a Network Provider under the Plan. "Mere contracting with those who perform services or maintain facilities is not the provision of health care, and companies, such as Optum, who maintain these contracts are not deemed the 'provider' of the service (even though they may provide the network)." *Amici* Br. 13.

In contrast, a reasonable factfinder could conclude that it was the practitioners who offered medical care services as health care providers that qualified under the SPD's Network Provider definition, as they actually provided the medical services to the Plan participants like Peters. *See* J.A. 3792 (in Aetna and Optum's subcontract, indicating that a Network Provider is "[a] duly licensed and qualified provider of health care services who is subcontracted with [Optum]"). Indeed, this is a logical reading of the definitions in

---

A: No. We do not touch a patient.
Q: Is Optum licensed to provide physical therapy or occupational therapy services?
. . .
A: No. We don't treat patients.
Q: Optum is not a treating provider?
A: Correct, we are not.

J.A. 2303–04.

50

question, as it gives full effect to the contrasting "Out-of-Network Provider" definition.[17]

Peters therefore produced sufficient evidence to create a genuine issue of material fact as to whether this asserted misrepresentation constituted a breach of fiduciary duty to support her claims for surcharge, disgorgement, and declaratory and injunctive relief under § 502(a)(1) and (3).

Next, we consider the remaining asserted breaches of fiduciary duty, which are analytically linked, beginning with the second asserted misrepresentation that resulted from the EOBs' use of "dummy codes" to bill for Optum's administrative fee. In their brief, *amici* discuss that the American Medical Association is the author and copyright holder of the CPT code set book. *Amici* Br. 1. This code set is critical as a "definitive resource to ensure that people and organizations are using the same language when referring to health care services." *Amici* Br. 4. "Critically, CPT codes *only* describe health care procedures and services." *Amici* Br. 5. Thus, a reasonable factfinder could plausibly infer that Aetna, as one of the "largest health care companies in the United States," *Amici* Br. 2, and CPT licensee with the American Medical Association, *Amici* Br. 5, misused the "dummy" CPT code because "CPT does not have 'catch-all' or 'miscellaneous' codes that can serve as a label for whatever . . . [Aetna] elect[s] to charge a member and their plan," *Amici* Br. 6. Peters therefore produced sufficient evidence to create a genuine issue of material fact as

---

[17] This is because an "Out-of-Network Provider" is "[a] health care provider or pharmacy that has *not* contracted with Aetna, an affiliate or a *third-party vendor* to furnish services or supplies for this Plan." J.A. 3067 (emphases added). Since the health care providers who assisted Peters were contracted with a third-party vendor (Optum), they could not be considered Out-of-Network Providers, *see* J.A. 1136 (the district court's characterization of Optum as a "third-party service provider" in its order on a motion to compel).

51

to whether Aetna utilized a dummy CPT code in direct contravention of the recognized purpose of the CPT code and thereby breached its fiduciary duty.

Turning to the third and fourth asserted misrepresentations, involving the EOBs' "amount billed," a reasonable factfinder could conclude that Aetna used the dummy CPT code to improperly include Optum's administrative fee in the bundled rate as the amount that the Plan and Peters owed for the claim. The plain terms of the SPD support Peters' argument that neither she nor the Plan were responsible for Optum's administrative fee, as it does not fall within the definition of a "Negotiated Charge" that could properly be assessed under the Plan. The SPD defined "Negotiated Charge" as "the maximum charge a Network Provider has agreed to make as to any service or supply for the purpose of the benefits under this Plan." J.A. 3067. Critically, "[t]he Plan does not cover expenses that are not considered Medically Necessary or appropriately provided," J.A. 3030, and "[c]harges for a service or supply furnished by a Network Provider in excess of the Negotiated Charge" are not covered, J.A. 3032. Thus, unlike the Negotiated Charge, a reasonable factfinder could conclude that Optum's administrative fee (1) was not charged by a Network Provider; and (2) fell into the category of uncovered expenses. So, even though Mars was paying Aetna for its services, the record on summary judgment is sufficient to support the inference that Aetna devised this cost-shifting scheme to avoid having to pay Optum for its subcontracted services in direct contravention of the SPD. Peters therefore produced sufficient evidence for a reasonable factfinder to conclude that Aetna breached the terms of the Plan, and thereby breached its fiduciary duty.

The MSA also supports this conclusion, indicating that a reasonable factfinder could conclude that Aetna violated it as well. The MSA between Mars and Aetna contained the Fee Schedule, explaining that "*[a]ll* Administrative Fees from this [Statement of Available Services] are summarized in the following Service and Fee Schedule." J.A. 6025 (emphasis added). ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ J.A. 6026, 6028. Accordingly, Aetna's compensation, in return for providing all of the agreed services under the MSA, is set at a ████████████████████, J.A. 6026, meaning that ███████████

██████████████████████████████████████████████████████████████████████

████████████ J.A. 3142. Reading this evidence in Peters' favor, there is no contract authority for any additional rate containing Optum's administrative fee, and more specifically, there was no exception for the dummy CPT code bundled rate to pass on the fees of Optum—or any other subcontractor—to the Plan or its participants. A reasonable factfinder could thus determine that doing so violated § 20(B) of the MSA, which dictates that "Aetna shall be solely responsible for payments due such subcontractors." J.A. 5999; J.A. 879 (in Aetna's press release regarding the Aetna-Optum relationship, representing that "[s]elf-funded plans will not be charged any fees for this program").

The record on summary judgment is sufficient to sustain a finding that Aetna circumvented the Plan terms by "burying" the administrative fee it owed Optum in the dummy CPT code claims process. A reasonable factfinder could conclude that such action contradicted the obligations Aetna had contracted to fulfill under the terms of the Plan and the MSA, effectively changing the terms of both without formal amendment of either. *See*

J.A. 6206 (Aetna's Rule 30(b) corporate designee, Jennifer Allison Cross Hennigan, confirming that Aetna was supposed to "pa[y] claims in a manner consistent with the terms of the plan"); J.A. 6032 (indicating in the MSA that "Aetna will process and pay the claims for Plan benefits . . . in a manner consistent with the terms of the Plan and the Services Agreement"); *Kim v. Hartford Life Ins. Co.*, 748 F. App'x 371, 374 (2d Cir. 2018) ("[Defendant insurance company] lack[ed] authority to modify the terms of the Plan . . . and [was] obligated to process claims in accordance with the Plan's written terms."); *see also Chao v. Malkani*, 452 F.3d 290, 295 (4th Cir. 2006) ("While a mistaken interpretation of plan terms hardly proves a fiduciary breach, defendants' bizarre reading—violative of both the Plan and ERISA—surely supports the overall conclusion that they were not acting prudently in managing the Plan." (internal citations omitted)). Based on the foregoing analysis, it naturally follows that Peters produced sufficient evidence to create a genuine issue of material fact as to whether Aetna's improper use of the dummy CPT codes and billing practice constituted separate actionable misrepresentations and amounted to breaches of fiduciary duty on Aetna's part.

iii.

Aetna attempts to undercut Peters' misrepresentation theory, asserting that she cannot prove reliance on these misrepresentations and properly noting that Peters conceded she did not rely on her EOBs.[18] However, the lack of reliance is not fatal to her theory of

---

[18] In her deposition, Peters revealed that she did not rely on her EOBs:
> Q:    So you didn't make any payments in reliance on this EOB, correct?

54

fiduciary breach because a showing of detrimental reliance is unnecessary for any of her claims. In *Amara*, the Supreme Court advised that "[l]ooking to the law of equity, there is no general principle that 'detrimental reliance' must be proved before a remedy is decreed." 563 U.S. at 443. The Court then assessed various forms of equitable relief under § 502(a)(3), considering whether a showing of detrimental reliance was required for each one. *Id.* at 443–44. For instance, the Court concluded that for purposes of estoppel, detrimental reliance was required simply "because the specific remedy being contemplated impose[d] such a requirement"—that is, that "the defendant's statement 'in truth, influenced the conduct of' the plaintiff, causing 'prejudic[e].'" *Id.* (second alteration in original) (citations omitted). In contrast, in the context of a claim for surcharge, the Court concluded that a showing of detrimental reliance was not always necessary because other forms of loss can account for harm:

> [A]ctual harm may sometimes consist of detrimental reliance, but it might also come from the loss of a right protected by ERISA or its trust-law antecedents. In the present case, it is not difficult to imagine how the failure to provide proper summary information, in violation of the statute, injured employees even if they did not themselves act in reliance on summary documents[.]

*Id.* at 444 (internal citations omitted).

---

A: No.
Q: And you didn't rely on any of the statements or information in this EOB to make any payments, correct?

. . .

A: Yes, that is correct.

J.A. 1671.

Here, following *Amara*'s example, we consider whether courts of equity would impose a requirement of detrimental reliance on the remedies at issue: As previously noted, Peters seeks restitution, surcharge, disgorgement, and declaratory and injunctive relief.[19] Based on *Amara*, these equitable remedies do not require Peters to demonstrate detrimental reliance. Beginning with her request for restitution to "restor[e] . . . monetary losses to self-insured plans," J.A. 58, restitution does not have as a characteristic an element that would suggest detrimental reliance was a necessary part of establishing a right to relief. This is evident when considering what we have held is required to establish a right to equitable restitution under ERISA: "[C]laimants must show that they seek to recover property that (1) is specifically identifiable, (2) belongs in good conscience to the plan, and (3) is within the possession and control of the defendant." *Brewer*, 867 F.3d at 479 (citing *Sereboff*, 547 U.S. at 362–63).

Next, as expressly noted in *Amara*, Peters' pursuit of surcharge "for the improper gains obtained in breach of [Aetna's] duties," J.A. 58, does not mandate a showing of detrimental reliance. Similarly, detrimental reliance is unnecessary to pursue disgorgement of Aetna's improper gains, if any, obtained from its breach of fiduciary duties. *Chauffeurs,*

---

[19] As indicated above, although Peters' claim for restitution is foreclosed based on her inability to demonstrate a personal financial injury, we nonetheless include this claim in our discussion of detrimental reliance as it has not been ruled out as a possible remedy for Peters' claims on behalf of the Plan, and this issue could arise on remand and is best settled now. We briefly note that while this form of relief does not require a showing of detrimental reliance (as discussed below), a showing of financial injury is still a threshold requirement. Accordingly, Peters' ability to demonstrate financial harm on behalf of the Plan for a restitution claim relies on the district court's assessment of whether the Plan suffered a gain or a loss as a result of Appellees' actions.

*Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990) ("[W]e have characterized damages as equitable where they are restitutionary, such as in 'action[s] for disgorgement of improper profits[.]'" (quoting *Tull v. United States*, 481 U.S. 412, 424 (1987)). Based on the requirements to establish each of these respective remedies, a showing of detrimental reliance is not necessary.

Finally, the same can be said for declaratory and injunctive relief "to remedy [Aetna's] past and ongoing violations of ERISA and breaches of fiduciary duty, including but not limited to enjoin further misconduct, [and] requiring [Aetna] to issue accurate EOBs." J.A. 58. Declaratory relief could be likened to an equitable proceeding known as a bill or petition for instruction, "one of the earliest forms of equitable declaration." Edwin Borchard, *Declaratory Judgments* 576 (2d ed. 1941). Such a proceeding operated as follows:

> The fiduciary who is in doubt must set forth the particular portion of the instrument concerning which he requests the determination of the court, and the facts on which he grounds his right to relief, showing that he has a present interest in a definitive adjudication of the question raised and supplying the names of any other parties who may be affected by the determination. The court, if it sees fit to grant the application, will then cite such parties as it deems requisite to show cause why the determination requested by the fiduciary should not be made. Whatever decree is then made, unless reversed or modified, is thereafter conclusive on all parties to the proceeding and compliance with instructions given relieves the fiduciary from liability.

*Executors' and Trustees' Bills for Instructions*, 44 Yale L.J. 1433, 1436 (1935) (footnotes omitted). None of these components implicate detrimental reliance. As for injunctive relief, in the context of permanently enjoining Aetna from issuing misleading EOBs, a court of equity would require that Peters show:

(1) that [she] has suffered an irreparable injury; (2) that remedies at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Again, none of these components implicate detrimental reliance, so Aetna's attempt to undercut Peters' fiduciary breach argument on this basis fails.

The district court erred in granting summary judgment to Aetna, as Peters produced sufficient evidence for a reasonable factfinder to conclude that Aetna was at least a functional fiduciary under ERISA and breached its corresponding fiduciary duties. Specifically, a reasonable factfinder could conclude that Aetna was unjustly enriched when avoiding payment of Optum's administrative fee and causing Peters and the Plan to shoulder that expense and therefore award Peters surcharge and disgorgement. *See Skinner*, 673 F.3d at 1167 (declining to surcharge the defendant under the unjust enrichment theory where the plaintiffs "presented no evidence that the [defendant] gained a benefit by failing to ensure that participants received an accurate SPD"); *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1008–09 (8th Cir. 2004) ("Under traditional rules of equity, a defendant who owes a fiduciary duty to a plaintiff may be forced to disgorge any profits made by breaching that duty . . . . We have precisely such a situation here. The district court concluded that First Reliance owed a fiduciary duty to Parke and that it breached that duty. First Reliance has not appealed that issue. Thus, First Reliance can be forced . . . to disgorge any profits it earned as a result of that conduct." (internal citations omitted)); *Amara*, 925 F. Supp. 2d at 260 ("In weighing unjust-enrichment surcharge, the question is

whether, but for CIGNA's [breach of fiduciary duty], CIGNA would not have obtained the cost savings that it did."). Moreover, a reasonable factfinder could find declaratory and injunctive relief appropriate based on the misrepresentations contained in the EOBs. *See, e.g.*, *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 718 (6th Cir. 2005) ("BCBSM is using an allegedly improper methodology for handling all of the Program's emergency-medical-treatment claims. Only injunctive relief . . . will provide the complete relief sought by Plaintiffs by requiring BCBSM to alter the manner in which it administers all the Program's claims for emergency-medical-treatment expenses."). Peters therefore withstood summary judgment on her claims for surcharge, disgorgement, and declaratory and injunctive relief under § 502(a)(1) and (3), and for her claims on behalf of the Plan for surcharge, disgorgement, and declaratory and injunctive relief—as well as possibly restitution—under § 502(a)(2).

## 2.

We now turn to whether Peters produced sufficient evidence to create a genuine issue of material fact as to Optum's status as a functional fiduciary as there is no basis in the record to show that Optum was a named fiduciary. In short, Peters has failed to show that Optum was operating as a functional fiduciary. But, as we explain, the district court improperly concluded at the summary judgment stage that Optum could not be held liable under the related theory that it was a party in interest engaged in prohibited transactions.

## i.

The district court twice concluded that Optum was not operating as a functional fiduciary, first in rejecting a motion to compel and later in granting summary judgment. In

59

doing so, it concluded that Optum could not be a functional fiduciary because Aetna retained the reigns in the Aetna-Optum contracts, which were negotiated at arm's length and involved Optum conducting purely administrative services. We agree.

The Aetna-Optum contracts support this conclusion, as the contracts did not delegate discretionary authority or control over the Plan or its assets to Optum. *See* J.A. 3895 ("[Optum] shall provide Claims Management Services in accordance with the terms of this Agreement, including applicable Mandates, accreditation standards, and [Aetna] standards[.]"); J.A. 3898 ("[Optum] agrees to cooperate with and participate in [Aetna's] applicable appeal, grievance and external review procedures (including, but not limited to, Medicare appeals and expedited appeals procedures), provide [Aetna] with the information necessary to resolve same, and abide by decisions of the applicable appeals, grievance and review committees. If [Aetna] determines that a claim that was initially denied, in whole or in part, must be paid, in whole or in part, [Optum] agrees to pay such claim or portion of such claim, as applicable, as [Aetna] directs."); J.A. 5580 ("[Optum] agrees to allow [Aetna] to maintain oversight of the Patient Management services furnished by [Optum]."); J.A. 5598 ("[Optum] agrees to comply with [Aetna's] benefit coverage guidelines.").

Even reading these contract excerpts in a light most favorable to Peters, the only reasonable inference that can be drawn is that, in contrast to exercising a degree of control or discretionary authority, Optum was serving in an administrative role as a third-party vendor, which is generally insufficient to give rise to functional fiduciary status. *See* 29 C.F.R. § 2509.75-8 (suggesting that "a person who performs purely ministerial functions . . . within a framework of policies, interpretations, rules, practices and procedures made by

60

other persons," such as applying "rules determining eligibility for participation or benefits," "advising participants of their rights and options under the plan," and collecting "contributions . . . as provided in the plan," is not acting in a fiduciary capacity). Peters contests this conclusion by utilizing out-of-context quotes from the record, none of which have probative value in support of her position that Optum was operating as a functional fiduciary. Thus, the only reasonable conclusion that can be drawn based on the totality of the covenants in the Aetna-Optum contracts is that Optum was not a functional fiduciary.

ii.

Whether Optum was a party in interest engaged in prohibited transactions with Aetna is a separate issue. While the district court indicated that Optum could not be a party in interest as a matter of law because Optum had no "pre-existing relationship[s]" with either the Plan or Aetna, J.A. 3240, this is incorrect. It is true enough that Optum had no prior relationship with the Plan before entering a service agreement with Aetna. But that means only that Optum was not a party in interest at the time it entered the agreement. Optum could become a party in interest after the execution of the Aetna-Optum contracts, when it became a service provider to the plan—that is, by making available its network of providers to plan members like Peters. *Compare with Danza v. Fid. Mgmt. Tr. Co.*, 533 F. App'x 120, 125 (3d Cir. 2013) ("While Fidelity is currently a party in interest as a service provider to the plan, it was not 'providing services' and was not a fiduciary when the Trust Agreement was signed, so that transaction did not fall within a prohibited category."). Thus, Optum could be a party in interest because it "provided services to the plan at the time [its administrative] fees were paid[.]" *Sweda*, 923 F.3d at 339.

61

Against this backdrop, we are persuaded that Peters has produced sufficient evidence at the summary judgment stage for a reasonable factfinder to conclude that Optum could be liable as a party in interest involved in prohibited transactions. Specifically, based on the totality of the record, a reasonable factfinder could determine that Optum "had actual or constructive knowledge of the circumstances that rendered [the bundled rate framework] unlawful." *Harris Tr.*, 530 U.S. at 251. As previously discussed at length, Optum was aware of Aetna's interest in burying the administrative fee in the claims process and was involved in the CPT dummy code scouting process. Moreover, its employees registered concerns over the legitimacy of the administrative fee billing model.[20] As such, even though Optum might not have been directly privy to the terms of the Plan, J.A. 2136 ("Optum has never received Aetna's plan[.]"), a reasonable factfinder could infer that Optum was fully aware of the questionable nature of the joint venture and concurred in it. Said another way, based on the record on summary judgment, Optum could be held liable as a party in interest involved in prohibited transactions based on its apparent participation

---

[20] J.A. 2647 ("The scenario where the co-insurance amount is calculated based on Aetna's payment to us is very problematic – the essence of the DOI complaint on this will be patients are being forced to pay a % of our fee, this is not going to viewed favorably by the DOI. . . . Our thinking so far feels a bit like circling the wagons and drinking our own Koolaid to support a position we have a hard time explaining and understanding, and one that most certainly will be viewed negatively by the DOI."); J.A. 2652 ("While we can spin it however we like, it is virtually impossible for the member and provider to make the math work on the co-insurance if we are basing claims adjudication on the co-insurance being calculated inclusive of our admin. This will lead to inquiries and complaints."); J.A. 2657 ("This isn't going away and won't take much longer to bubble up to be a substantial issue. I'm not sure anyone can explain the math to a provider, patient, or DOI[.]"); J.A. 5708 (noting that "while we don't like the admin fee, if we refuse we'll lose business").

in and knowledge of Aetna's administrative fee billing model. We therefore conclude that the district court erred in granting summary judgment to Optum in so far as that it could not be held liable as a party in interest under ERISA.[21]

III.

Finally, we consider the district court's denial of Peters' motion for class certification. In her motion for class certification, Peters sought to represent two classes: (1) "[a]ll participants or beneficiaries of self-insured ERISA health insurance plans administered by Aetna for which plan responsibility for a claim was assessed using an agreed rate between Optum and Aetna that exceeded the provider's contracted rate with Optum for the treatment provided"; and (2) "[a]ll participants or beneficiaries of ERISA health insurance plans insured or administered by Aetna for whom coinsurance responsibility for a claim was assessed using an agreed rate between Optum and Aetna that

---

[21] We briefly note that Peters did not abandon her claims against Optum based on her counsel's statements during oral argument. Peters' counsel represented that Peters did not need to establish liability against Optum to proceed on her claims against Aetna and that her goal was holding Aetna responsible for its actions: "[I]n reality, Aetna is the only one that really needs to be held liable. . . . We don't need Optum to be found liable. Aetna is the one who came up with this idea. It's the one who was unjustly enriched." Oral Argument at 13:26–31, 14:35–42, *Peters v. Aetna Inc.* (No. 19-2085) (4th Cir. Oct. 26, 2020), https://www.ca4.uscourts.gov/OAarchive/mp3/19-2085-20201026.mp3. These ambiguous statements do not amount to waiver because Peters clearly asserted her claims against Optum in her briefs and did not specifically abandon any of these claims in oral argument. *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 92–93 (4th Cir. 2018) (explaining that a plaintiff's ambiguous addressal of a particular claim during oral argument "did not rise to a clear and unambiguous abandonment" of that claim, considering that the plaintiff "had consistently pursued [it] throughout the case").

exceeded the provider's contracted rate with Optum for the treatment provided."[22] J.A. 1183. The district court denied certification, concluding that the ascertainability and commonality requirements under Rule 23 of the Federal Rules of Civil Procedure could not be met.

As to ascertainability, the district court discounted Peters' theory of financial injury, which led it to the conclusion that Peters "failed to demonstrate that there exists a class of participants who have actually been harmed by the Aetna-Optum arrangement." J.A. 2729. It also opined that to ascertain the members of Peters' proposed classes, it "would be forced to engage in a highly individualized inquiry of *every* plan, *every* participant and *every* claim in those participants' claim histories, taking into account the impact of each participant's deductible, copayments, coinsurance, and out-of-pocket maximum." J.A. 2734–35. As to the latter requirement of commonality, the district court focused on the benefits accrued based on the Aetna-Optum relationship and determined that "[a] proposed class

---

[22] We briefly circle back to standing in the context of class actions. "[O]nce an individual has alleged a distinct and palpable injury to h[er]self [s]he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 517 (6th Cir. 1976); *see also Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) ("In a class action, 'we analyze standing based on the allegations of personal injury made by the named plaintiff[].'" (citation omitted)). This is because "the standing-related provisions of ERISA were not intended to limit a claimant's right to proceed under Rule 23 on behalf of all individuals affected by the challenged conduct, regardless of the representative's lack of participation in all the ERISA-governed plans involved." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998). As we determined earlier that Peters has Article III standing, we therefore consider her request for class certification under Rule 23 because "[o]nce . . . standing has been established, whether a plaintiff will be able to represent the putative class . . . depends solely on whether [s]he is able to meet the additional criteria encompassed in Rule 23." *Id.*

64

challenging conduct that did not harm – and in fact benefitted – some proposed class members fails to establish the commonality required for certification." J.A. 2735.

The threshold requirements for class certification under Rule 23(a) are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). Apart from the enumerated requirements, "Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). Under this principle, sometimes called "ascertainability," "[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.* A plaintiff "need not be able to identify every class member at the time of certification." *Id.* "But '[i]f class members are impossible to identify without extensive and individualized fact-finding or "mini-trials," then a class action is inappropriate.'" *Id.* (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).

Considering commonality, although the rule speaks in terms of common questions, "what matters to class certification . . . is . . . the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (first alteration in original) (citation and internal quotation marks omitted). A single common question will suffice, *id.* at 359, but it must be of such a nature that its determination "will resolve an issue that is central to the validity of each one of the claims in one stroke," *id.* at 350. This Court reviews the district court's

65

certification decision for an abuse of discretion. *Doe v. Chao*, 306 F.3d 170, 183 (4th Cir. 2002).

The district court analyzed ascertainability and commonality too rigidly. Specifically, the district court hinged its lack-of-ascertainability determination on its perception of Peters' theory of financial injury. As explained above, however, Peters has withstood summary judgment on claims that support her request for certain equitable forms of relief on behalf of herself and the Plan: surcharge, disgorgement, and declaratory and injunctive remedies without regard to financial injury. Thus, the district court's basis for denying class certification as to surcharge, disgorgement, and declaratory and injunctive relief was erroneous. And the Plan's entitlement to a remedy of restitution has yet to be determined.[23]

The same harms that would support Peters' request for equitable relief regarding surcharge, disgorgement, and declaratory and injunctive actions may be cognizable and identifiable in the ascertainability context, leading us to the conclusion that the class

---

[23] As previously established, Peters' individual claim for restitution fails. Although "a plaintiff's capacity to act as representative of the class is not ipso facto terminated when he loses his case on the merits," *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1215–16 (11th Cir. 2003), "[the Supreme Court] has repeatedly held [that] a class representative must be part of the class and possess the same interest and suffer the same injury as the class members," *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citation and internal quotation marks omitted). Because Peters suffered no direct financial injury to support her individual claim for restitution on the merits, she cannot be a valid class representative to pursue this claim. *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 431 (6th Cir. 2018). We express no opinion on Peters' ability to operate as class representative as to the remaining claims, including those of the Plan. On remand, the district court should determine in the first instance whether Peters is qualified to serve as class representative as to those claims if it finds that the class action can be maintained.

members may also be ascertainable for those claims for relief. Indeed, the proposed class members appeared to be objectively identifiable based on Appellees' own data, as Peters identified 87,754 members who experienced a scenario such as hers, where they (or their plan) were charged Optum's administrative fee. J.A. 4313; *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (finding that proposed class was ascertainable as class-wide data allowed for identification on a "large-scale basis"). The district court's narrow focus on ascertainability (*i.e.*, only through the lens of Peters' financial injury theory) constituted an abuse of discretion regardless of Peters' ability to satisfy Rule 23 *in toto*. *E.g.*, *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 481 & n.8 (3d Cir. 2020) (analyzing ascertainability, but "express[ing] no opinion on whether the other requirements for certification under Rule 23 [were] satisfied [because] . . . [t]he District Court did not consider the issue"). The district court must reexamine the ascertainability prong based on Peters' claims that survive the motions for summary judgment as explained previously.

The district court also abused its discretion at this stage when assessing commonality, stating that "the evidence indicates that, in the aggregate, the Aetna-Optum contracts saved plans and their participants millions of dollars," implying that Peters could not demonstrate that the proposed class members suffered the same injury. J.A. 2735 (emphasis omitted). Recall, though, that the district court's basis of analysis was erroneous as it failed to recognize the totality of the claims actually made. We believe, therefore, that Peters' proposed classes may be able to meet the commonality requirement when that requirement is reexamined based on the claims that survive the motions for summary judgment as explained previously. Indeed, there are common issues of law and fact,

67

including, for instance, whether Aetna was a fiduciary; whether it breached its duties to plans and plan participants by directing Optum to bury its administrative fee in the claims process; and whether its breach amounted to a harm as to the particular plan and plan participants. *See In re Schering–Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009) (finding the commonality requirement met where the following common questions were identified: "whether the defendants were fiduciaries; whether defendants breached their duties to the Plan by failing to conduct an appropriate investigation into the continued investment in Schering-Plough stock;" whether they failed to adequately to monitor the plan's investment committee; whether they failed to hire independent fiduciaries; and whether their breaches caused plan losses). These types of common questions may be sufficient to meet the commonality requirement, as they may "generate common answers apt to drive the resolution" of the Appellees' liability. *Wal-Mart*, 564 U.S. at 350 (citation and emphasis omitted).

Appellees respond that these queries cannot be answered with common evidence because of varying EOBs, plans, and damages. While these distinctions among proposed class members may affect the dollar amount or scope of the available remedies, they do not reflexively defeat class certification when the underlying harm derives from the same common contention—that Appellees' fee-shifting scheme breached the terms of the applicable Plan and constituted a breach of fiduciary duty. As noted earlier, we fail to see how surcharge, disgorgement, or declaratory and injunctive relief would necessarily be foreclosed here in a class context based on the record to date. Indeed, the district court could limit the common questions to eliminate or streamline those without proven

68

commonality. And if Peters' theories depend on distinct proof or legal questions common to some but not all class members, then subclasses may be created for purposes of case management. *See* Fed. R. Civ. P 23(c)(5), (d); 3 William B. Rubenstein, *Newberg on Class Actions* § 7:32 (5th ed. Dec. 2020 update) (noting that Rule 23(d) "authorize[s] a class action court to create subclasses for management purposes" and "expedite resolution of the case by segregating a distinct legal issue that is common to some members of the existing class" (alterations omitted)). And, as in any class proceeding, it remains for a determination on the facts presented which plans fit, or fail to fit, in a given class.

Appellees finally contend that Peters' proposed classes cannot meet the far more demanding standard in the predominance requirement under Rule 23(b). However, there is no need to decide this inquiry at this point, as Rule 23(b) was not addressed by the district court. On remand, the district court would need to consider anew whether all the requirements of Rule 23(a) are met before proceeding to consider any of the Rule 23(b) requirements. *E.g.*, *EQT Prod.*, 764 F.3d at 367 (considering the commonality requirement and explaining that "[w]e do not decide today whether the disparate practices identified by the defendants are sufficient to defeat the predominance requirement"). We express no opinion on Peters' ability to meet the full criteria of Rule 23 on remand, but nonetheless conclude that it was an abuse of discretion for the district court to disregard the available equitable remedies in support of its conclusion that Peters' proposed classes failed to meet the commonality requirement for purposes of Rule 23(a) at this stage.

Accordingly, we vacate and remand the district court's order denying class certification, so that the district court may consider anew its analysis of all the Rule 23

requirements in conformity with this opinion. *E.g.*, *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996) ("[T]he court's decision to deny certification was affected by his [erroneous summary judgment] ruling, which we have reversed . . . . We therefore also vacate the court's order denying certification so that it can be reviewed in light of our ruling here.").

IV.

For the foregoing reasons, we hold that Peters experienced no direct financial injury as a result of Appellees' use of the bundled rate in the claims process. Based on her inability to demonstrate a direct financial injury, we affirm the district court's judgment on Peters' personal claim for restitution under § 502(a)(1) and (3). However, as we are unable to conduct appellate review of Peters' restitution claim on behalf of the Plan under § 502(a)(2), we vacate and remand that claim to the district court for development of the record as necessary and resolution in the first instance under *Donovan*.

As for Peters' claims for surcharge, disgorgement, and declaratory and injunctive relief, which do not require a showing of direct financial injury, we are persuaded that she has produced sufficient evidence for a reasonable factfinder to conclude that Aetna was operating as a functional fiduciary under ERISA and breached its fiduciary duties. We also conclude there is sufficient evidence in the record upon which a reasonable factfinder could find that Optum was acting as a party in interest engaged in prohibited transactions, but not as a fiduciary. We therefore reverse the district court's judgment as to Peters' claims for surcharge, disgorgement, and declaratory and injunctive relief under § 502(a)(1) and (3),

70

and for her claims on behalf of the Plan for surcharge, disgorgement, and declaratory and injunctive relief under § 502(a)(2) and remand those claims for further proceedings consistent with this opinion.

Finally, we hold that the district court abused its discretion in denying Peters' motion for class certification when it failed to properly ascertain the full measure of available remedies. Accordingly, we vacate and remand the district court's order denying class certification for a full reevaluation under Rule 23 in conformity with this opinion.

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED*